In the Matter of Baldwinsville Federal Savings & Loan Association, Respondent.

Floyd W. Van Wie, Appellant; Frederick W. Fuess, Jr., et al., Respondents.

Fourth Department, November 15, 1944.

*Hiscock, Cowie, Bruce, Lee & Mawhinney (Donald M. Mawhinney* of counsel), for appellant.

*Frederick W. Fuess, Jr.,* for Baldwinsville Federal Savings & Loan Association and Frederick W. Fuess, Jr., respondents.

*Brown, Mangin & O'Connor* for Lewis M. Tappan and others, respondents.

*Hancock, Dorr, Ryan & Shove* for Alfred G. Forssell and Walter McCarthy, respondents.

LARKIN, J. In 1928 the Baldwinsville Savings & Loan Association, the predecessor of the Baldwinsville Federal Savings & Loan Association, was incorporated under the New York Banking Law. In 1936, as authorized by former section 497 (now § 409) of that law, it voted to become a Federal association and applied to the Board of the Federal Home Loan Bank, as provided by section 5 of the Home Owners' Loan Act of 1933 (U. S. Code, tit. 12, § 1464), for a charter, which was issued to it March 17, 1937. By the same section (former § 497, *supra*) upon filing a copy of this charter with the Superintendent of Banks, the association ceased to be a corporation organized under the laws of this State, and succeeded to all the property, rights and privileges of the domestic association. Since March 17, 1937, it has operated as a Federal corporation at Baldwinsville, N. Y. All of its officers and directors are citizens and residents of the State of New York.

Section 5 of the Home Owners' Loan Act (*supra*) empowers the Board of the Federal Home Loan Bank, under such rules and regulations as the Board may prescribe, to provide for the organization, incorporation, examination, operation and regulation of 'Federal savings and loan associations, and to issue charters therefor. Upon the issuance of a charter by the Board the association automatically becomes a member of the

Federal Home Loan Bank of the district in which the association may be located. The record does not disclose whether any rules or regulations, other than the charter, were prescribed for this association by the Board. The association's charter, section 5, reads as follows: " Directors and officers. The association shall be under the direction of a board of directors of not less than 5 nor more than 15, as determined and elected by the members. * * * At the *first* meeting of members of the association, directors shall be elected to serve until the *first annual meeting* and until their successors are duly elected and qualified. *Thereafter* directors shall be elected for periods of *3* years and until their successors are elected and qualified, but *provision* shall be made for the election of approximately *one-third* of the board of directors each year." [Italics supplied.]

Section 3 of the charter authorizes the association to adopt by-laws for the management of its property, and the regulation and government of its affairs. Since the charter was not issued until March 17, 1937, the by-laws, which are made a part of the petition, were undoubtedly adopted in 1937. Section 1 thereof fixes the date of the annual meeting for the third Wednesday of January of each year. Although again not shown by the record, inferentially at least, at the first meeting of the association, probably held in 1937, directors were elected who, of course, served only until the first annual meeting of the association in January, 1938. At that meeting, seemingly, eleven directors were elected, four for three years, four for two years and three for one year. These facts appear, again, only inferentially.

At the annual meeting in 1944, which is the subject of this controversy, the members attending divided into two groups. Of one, petitioner, whose term of office as director last elected in 1941, expired at that meeting, was the organizer, while another director, Brown, led the opposing group. Each seems to have solicited proxies prior to the meeting. At this meeting, although the total number of votes which could have been cast was approximately 8,200, the total number present, including proxies, was about 2,200. With the terms of five directors expiring at that meeting, it was unanimously determined to increase the Board membership from twelve to fifteen. Brown then nominated eight directors, but petitioner was not one of them. Petitioner then nominated a member, not one of the eight nominated by Brown, and petitioner's own name was placed in nomination. Before the balloting began petitioner called the attention of the meeting to the fact that the eight directors could not be

elected for a term of three years, but that they should be classified. In reply, Brown, the spokesman for his group, stated, in substance, that the matter would be taken care of later. Thereafter, without further protest, the meeting proceeded to ballot. All of the eight directors named by Brown were elected by a majority of all the votes cast, even the director of that group receiving the lowest number of votes having a very substantial margin over petitioner, the higher of the two nominees of his group. There seems little question that the members understood that they were voting for eight directors for a term of three years, although that question was rather sharply contested on the hearing at Special Term. The meeting then adjourned and immediately the Board of Directors convened. Brown was elected president of the association. Petitioner, although no longer a member of the Board, tendered his assistance and sat with the directors in this first meeting. The next day he assisted Brown in acquainting him with the corporate business.

Thereafter he began this present proceeding under section 25 of the General Corporation Law. The matter was heard at Special Term. Proof was apparently made by the pleadings, affidavits and oral testimony. Seventeen of the eighteen members present at the meeting were called as witnesses. The Brown group insisted that the action of the meeting was in accord with the charter, and further that petitioner was not an aggrieved person within the meaning of section 25 (*supra*) because he had ratified and confirmed the action of the meeting in electing the directors for three years. This claimed ratification was, seemingly, based upon the following: *First,* that he, himself, had been elected a director in 1941 for a term of three years, as one of five then elected, when the directorate was increased from eleven to twelve without proper classification; and *Second,* that conceding he did protest the irregularity before the balloting, he acquiesced in the statement that the matter would be taken care of later, and thereafter permitting his own name to remain as a nominee, voted for himself as one of the directors to be elected for a term of three years. The Special Term, without deciding whether or not petitioner was an aggrieved party, dismissed the petition, but without prejudice to the right of petitioner or any aggrieved person to institute a new proceeding in the event that, at the annual meeting in January, 1945, the irregularity in failing to classify the eight directors was not corrected. From the order entered petitioner appealed to this court.

Evidently the Special Term took the view that the violation of the rather awkward provision found in section 5 of the charter was a mere irregularity which did no actual harm, because even had the directors been properly classified before the voting, the result, in view of the strong preponderance in favor of the Brown faction, would have resulted in the election of the same directors, and that since they were at least *de facto* directors, to permit them to hold until the meeting in January, 1945, could do no harm. Although the Special Term's decision was a pragmatic one, apparently it is not one authorized by section 25 (*supra*). The procedure therein provided is statutory, and such a proceeding does not have the true character of an equitable action. Had there been a finding that petitioner was not an aggrieved person, the dismissal would have been proper. However the opinion of the Special Term indicates that no such finding was made. Seemingly, the only authority given the Special Term is either to confirm the election, or order a new one. The words '' as justice may require,'' logically modify the words specifying the relief which may be granted.

Although it is true that the provision as to the terms of office of the directors and their classification is phrased in rather cloudy language, the purpose is evident. Patently it is the intention that, as nearly as possible, the terms of office of the directors shall be so staggered that never more than one third will expire in any one year. This will insure to the association presence on the Board always of at least two thirds who are experienced in its business Such a provision is not an unusual one. (2 Thompson on Corporations [2d ed.], § 1080, p. 16; Banking Law, § 376, subd. 1, par. [b].) Since section 5 of the charter provides for the election of directors at the first meeting to hold until the first annual meeting, clearly it cannot contemplate the election of their successors at that meeting for the term of three years. As indicated by the position of the word '' Thereafter '' it was not intended that this provision for terms of three years should apply to those directors elected at the first annual meeting. It is only by such a construction that full force can be given to the express language requiring that the directors be classified. If, then, the directors were properly staggered at the first annual meeting the situation would thereafter take care of itself. Although ordinary corporate powers are those expressly stated in the charter, still it is also fundamental that a corporation has such additional powers as are, by implication, necessary to carry out, effectually, the powers expressly granted. In this charter,

while the term of office of directors elected after the first annual meeting is fixed at three years, yet it is coupled with a mandatory obligation, a continuing one, to see to it that at all times the directors are properly classified. In the event then of an increase, after the first annual meeting, of the number of directors, the power of the members to elect the additional directors would seem, by implication, necessarily, also, to permit such additional directors to be elected for such terms — less than three years — as would carry out the principle of classification. Unless that construction be given to this charter, then what seems clearly to be a basic principle of the constituency of the directorate would be completely nullified. Applying this construction to the meeting of 1944, since, after the increase, the directorate was to be fifteen, with the terms of office of five expiring at the meeting, three the next year, and four the year thereafter, it seems perfectly patent that the three additional directors should have been elected for the terms of — two for one year and one for two years. Had this been done the meeting would then have exercised the power which it had to increase the membership of the Board to fifteen, and at the same time it would have given full force to the requirement for classification. This seems the only logical and sensible construction to make of this charter, for to hold otherwise, namely — that the eight directors could be elected properly for terms of three years would be to ignore completely the requirement that the Board of Directors be divided into three classes, which scheme should be preserved. (Cf. Stock Corporation Law, § 55.) The election of the eight directors at the 1944 meeting was clearly irregular and must be corrected. Since the annual meeting in January, 1945, is now but approximately two months away, it can be done then, instead of at a special meeting called for that purpose only. This course was followed in *Matter of Flushing Hospital & Dispensary* (288 N. Y. 125) which, however, did not involve classification.

It is interesting to note that in some manner not disclosed by the record, the directorate was apparently classified at the first annual meeting in 1938. In the testimony of the witness Schenck there is a suggestion from which one might infer that all of the directors were first elected, and then by means of a drawing by the directors themselves, the length of each of their terms was fixed. Possibly, although all the directors elected at the 1944 meeting were so elected for terms of three years, they could have properly classified themselves by filing with the association a consent as to the expiration of their terms, having

regard to the fact that the terms of office of three others would expire in 1945 and four others in 1946. Such a procedure was approved in *Matter of Directors of Washington Cemetery* (135 Misc. 763) as being, in substance, a resignation effective at the expiration of the time stipulated by the director as the end of his term. Since the charter is silent as to the manner in which the Board is to be staggered after the first annual meeting, one would be inclined to uphold any method by which it might be accomplished.

Despite the fact that it may have been possible for the directors to have classified themselves prior to the time the matter was heard in Special Term, nothing had been done to correct the irregularity which contravened what is the clear intent of the charter. Under such circumstances it would seem to follow that the Special Term's order should have done one of two things, either directed a new election, unless the eight directors classified themselves on or before a date fixed for same, or else ordered a new election, without condition. As already noted, although the eight directors elected in 1944 cannot be said to be *de jure* directors, they are at least *de facto*, having taken possession of the office by virtue of the color of an election. Therefore they are entitled to hold until their successors are regularly elected.

Passing next to petitioner's status as an aggrieved person, upon which the Special Term did not pass, a rather troublesome question develops. It is a fundamental rule applicable to all corporate elections that a stockholder who participates in a meeting and either votes for or adopts the irregular or illegal procedure, cannot be heard to complain thereafter. (*Matter of Appl'n of Syr., C. & N. Y. R. R. Co.*, 91 N. Y. 1; *Matter of Scheel*, 134 App. Div. 442; *Matter of Hammond Light & Power Co., Inc.*, 131 Misc. 747, affd. 224 App. Div. 684.) Under the authority of these cases, if they are broadly interpreted, as well as the rule stated by both Fletcher (5 Fletcher's Cyclopedia Corporations, § 2024, p. 99) and Thompson (1 Thompson on Corporations [2d ed.], § 934) in their respective works on corporations, it might well be that petitioner was not an aggrieved person because (1) he, himself, participated in an election which, while not as flagrantly violative of the classification feature of the charter, still did violate it when he was elected a director at the meeting in 1941; and (2) although he concededly protested before the balloting it might be found that he acquiesced in the irregular practice by thereafter voting in the election, knowing that no pro-

vision was being made for a proper classification of the directors to be elected. However, as against such a finding, it is fairly established that Brown who was a lawyer and the leader of the opposing faction stated to petitioner, a layman, after petitioner had protested, that the matter of staggering the Board of Directors' would be taken up later. It might well be that petitioner relied upon that statement and assumed that either the directors would immediately classify themselves at their first meeting or, that following the election they would be classified in some manner, such as was evidently pursued at the first annual meeting in 1938. The entire idea that he is not an aggrieved person stems from the principle that he necessarily ratified what was done. In *Slee* v. *Bloom* (19 Johns. 456) the Court of Errors declined to find a ratification of illegal acts on the part of a corporate trustee where he had protested the action, even though thereafter he accepted the fruits of the claimed illegality. Taking all the circumstances of the present situation into consideration a finding that petitioner is an aggrieved person is authorized.

The last question involved, one which was not raised either at Special Term or on this appeal, is one of jurisdiction, namely, the application of section 25 of the General Corporation Law to this Federal association, concededly an agency of the United States Government. The rule of the application of State statutes to Federal agencies is well established, certainly as to national banks, and after all, this association falls into the category of a bank, although not governed by the same act of Congress as is a national bank. That rule frequently declared by the United States Supreme Court is stated in *Lewis* v. *Fidelity Co.* (292 U. S. 559, 566): "But a national bank is subject to state law unless that law interferes with the purposes of its creation, or destroys its efficiency, or is in conflict with some paramount federal law." (Citing various cases, including *First Natl. Bank* v. *Missouri,* 263 U. S. 640, 656.) *Matter of Tuttle* v. *Iron Nat. Bank* (170 N. Y. 9) held that the Supreme Court of this State had power in its discretion, by mandamus, to compel the directors and officers of a national bank in process of liquidation to exhibit to the stockholders the books, papers and assets of the bank. In *Lauer* v. *Bayside National Bank* (244 App. Div. 601) the Appellate Division, Second Department, affirmed an order dismissing the complaint in an action brought against a national bank, its officers and directors, for the penalty provided by section 10 of the Stock Corporation Law, for refusing plaintiff permission to inspect

the stock book of the corporate defendant. While the court recognized that national banks are citizens of the State in which they are located and that although subject to the paramount authority of the United States, nevertheless they are subject to State laws as to their affairs, unless such laws conflict with a paramount law of the United States, still it dismissed the complaint in the action there considered because it held that section 10 (*supra*) was in conflict with the provisions of the National Banking Act. Section 40 (U. S. Code, tit. 12, § 62) of that Act requires the president and cashier of every national bank to keep, at all times, a full and correct list of the stockholders in the banking office, and further provides that such list shall be subject to the inspection of the stockholders and creditors of the association and the State taxing authorities, during business hours of each day. Section 40, however, contains no penalty such as is found in section 10 of the Stock Corporation Law. The court held that since Congress had legislated on the subject of the duty of a national bank to permit inspection of its records by its stockholders, it was not within the province of the New York Legislature to enact a law supplementing such Act of Congress. In other words, the State act conflicted with the paramount Federal Act. That is not the situation here. Neither the Home Owners' Loan Act nor the Federal Home Loan Bank Act (U. S. Code, tit. 12, ch. 11) contains any provision providing for the review of elections of directors of Federal savings and loan associations. Nor has attention been called to any rule or regulation of the Board of the Federal Home Loan Bank covering the subject. Nor has any Federal statute applicable to a situation like the present been called to attention. It is difficult to see how a proceeding under section 25 of the General Corporation Law would thwart or frustrate the purpose for which this Federal savings and loan association was incorporated, or impair its efficiency, if, thereby, the Supreme Court of the State of New York took jurisdiction of a dispute of this character simply to determine whether or not the association had complied with its charter. Moreover an examination of sections 408 and 409 (*supra*) of the Banking Law indicates quite clearly that the Legislature of the State of New York did not intend to treat the Federal association as a foreign corporation. The usual objection urged for a refusal by the courts of this State to take jurisdiction of the internal affairs of a foreign corporation (*Sternfeld* v. *Toxaway Tanning Co.*, 290 N. Y. 294, 297) hardly applies to this association which, by subdivision 7 of section 7 of the Civil Practice Act, is a domestic corpora-

tion, at least in construing that Act. Moreover the association's officers and directors are all residents of this State. It seems, then, reasonably certain that the present proceeding was properly brought under section 25 of the General Corporation Law. Nothing in *State, ex rel. Wilcox,* v. *Curtis* (35 Conn. 34) or *State ex rel.* v. *Barboglio et al.* (63 Utah 432) holds to the contrary. All that was held by these decisions is that an action in the nature of quo warranto, to try the title to office of a director of a national bank, cannot be brought in a State court because quo warranto is a prerogative of the government which charters the corporation.

For the foregoing reasons the order of the Special Term should be modified on the law and facts and a new election ordered to be held in connection with and at the same time and place as the annual meeting in 1945, when successors to the eight directors elected at the 1944 meeting shall be named. In view of the fact that in addition to these eight, the terms of office of three others will expire at the same meeting, making eleven in all to be elected, the association, its directors and officers, are directed to give notice in the manner provided by section 3 of the by-laws for the calling of a special meeting, to all the members who, on the books, appear to be eligible to vote at the 1945 annual meeting, and that such notice shall state that in addition to the election of successors of the three directors whose terms will expire at that meeting, eight other directors will be named as successors to those elected at the 1944 annual meeting, and as so modified the order should be affirmed, without costs. Certain additional findings of fact are made.

All concur. Present — CUNNINGHAM, P. J., DOWLING, HARRIS, McCURN and LARKIN, JJ.

Order modified on the law and facts in accordance with the opinion and as modified affirmed, without costs of this appeal to any party. Certain new findings of fact and conclusions of law made. Stay of proceedings heretofore granted continued until February 1, 1945. [See amended decision, 268 App. Div. 1024.]