John Irwin and Others, Individuals Suing on Behalf of Themselves and of All Other Members of Local Union No. 125 of the International Union of Operating Engineers, Similarly Situated, Plaintiffs, *v.* John Possehl, Individually and as General President of the International Union of Operating Engineers, and Others, Defendants.

Supreme Court, Bronx County, June 2, 1932.

*Owen S. M. Tierney*, for the plaintiffs.

*James E. Smith*, for the defendant.

Hammer, J. The plaintiffs, 630 of the members of Local Union No. 125 of the International Union of Operating Engineers, by this action ask that defendant Commerford be restrained from continuing to exercise powers alleged to have been employed heretofore and now to be used illegally as supervisor over and in the conduct of the affairs of Local Union No. 125 and that the defendant officers and business agents appointed or selected by

him for said local union be similarly restrained; that said supervisor, officers and agents be required to account for the assets, moneys and property of said union and that in the meantime a receiver be appointed to conserve the same; that an election of officers be required to be held, and also a meeting of the local union for the adoption of by-laws prescribing the powers and duties of the new officers.

It is well settled that courts ordinarily do not concern themselves with the contentions and quarrels of members and subordinate or affiliated bodies of voluntary associations. Any of such who have grievances are usually required in the first instance to resort to the remedies for redress provided by the rules and regulations of such voluntary association.

The rule referred to and enunciated in innumerable cases is reasonable and salutary and with it I am in full accord. However, the reason for entertaining jurisdiction and authority for deciding the question here presented is so clearly stated in *Rodier* v. *Huddell* (232 App. Div. 531), another action between some of the parties in this action, decided by the Appellate Division of this court, First Department, in April, 1931, that it may be appropriately repeated here as completely answering defendants' jurisdictional questions. The court there stated: " The rule requiring that a member must exhaust his remedies within the organization before applying to a court of equity for relief is subject to the qualification that the suspension [*or the act or acts complained of*] must have followed a legal and regular proceeding within the organization. Where the proceeding is irregular, the association acquires no jurisdiction to make the order, and the person aggrieved thereby may seek redress by a direct appeal to the courts. (*People ex rel. Deverell* v. *M. M. P. Union*, 188 N. Y. 101; *Kohler* v. *Klein*, 39 Misc. 353, 354.) * * * (*Wachtel* v. *Noah Widows & Orphans' Society*, 84 N. Y. 28.) * * * In any case an appeal within the organization would have been a vain thing. The only appeal provided is to the general executive board of the International. This board consists of seven members, of which the defendant Huddell was the head and in general control. A suspended member is not required to pursue his remedy by appeal within the organization when such appeal is to a board so constituted as to afford no likelihood of an impartial hearing. (*Matter of Brown*, 34 Misc. 556; affd., 176 N. Y. 132; *Corregan* v. *Hay*, 94 App. Div. 71; *Fritz* v. *Knaub*, 57 Misc. 405.)" (Italic words in brackets are mine.)

It cannot be held as a matter of law that the constitution of the parent union and its general laws and rules amply and adequately provide for the determination of the issues herein raised within

itself by resort to its own tribunals and that the court is accordingly without jurisdiction.

The question of jurisdiction raised by the defendants can only be determined upon a consideration of the facts alleged and proved.

In considering the matters at issue it is well to have in mind the basic background against which the facts herein may be viewed and thus properly evaluated.

A labor union is a society of its members. Its constitution is the conditions upon which such members become associated. If the members, by any of such conditions, were required to give. or to promise, blind obedience to the leaders, the society would be to that extent bad in its constitution, and such condition illegal,

Trade unions are either descendant from or are the outgrowth of the idea and form of the guilds of the middle ages. Modern industrial conditions and the capitalist system, however, are the direct reasons for the organization of workingmen into trade unions. The method at first was adopted for self protection, but the movement has grown into an organized means for the improvement, socially and economically, of the status and place of the worker, the acquirement and the maintenance of labor standards, and the changing of industry in accordance with labor ideals. Originally existing largely as secret bodies, trade unions universally have been given public recognition as moral, beneficent and constructive not alone for the good of the membership but also for the general human welfare. They are an integral part of society, and regarded as responsible representative bodies, expressive of the workers' point of view.

Since labor unions are recognized as moral and beneficial to workers and society, such construction should be given to a particular provision of the union's constitution and laws that it will be legal and moral, rather than morally unlawful. Better working conditions, including wages, hours, sanitation, safety, and kindred subjects, and mutual insurance, are the chief aims of the union. The spirit and power of the working classes in their resistance to being crowded down is the only force from the economic point of view which can and will save economic society from progressive degradation. No economic advantage has been secured by any class of workers except by its own organized resistance and aggressiveness. Organizations act through leaders or officers or agents and it is usually through their endeavors backed by the organized effort of the members that results are accomplished. But the class is made up of its members, and each member is entitled, equally with each other member, to the right to seek and pursue, and the opportunity, rather than the absolute right, to become

possessed of any and every advantage thus secured. If any member is deprived of such equal right, not only is an injustice done to that individual, but the entire class suffers. The class injury results because such advantage, obtained through the organized effort, resistance and aggressiveness, is lost or taken away from the individual member who, to the extent of the injustice, is the representative unit of the class as an organization or representative whole. Multiply such injustice to the individual many times and the result might well be disintegration of the class organization back into the weak and unprotected status of the unorganized individual workers in unrestrained competition against one another, and subject to the employer's direct dealing with each unprotected and unorganized worker. Weakened by internal dissentions the result of well-defined notions of official oppression, the union and its members may become vulnerable to the attack of organized employers and a ready prey of those pseudo labor groups who in times of distress are keenly active in attempts to lead the workers away from those safe moorings recognized in the expression of the ideals of union men by the leaders, past and present, of the American Federation of Labor.

The organization has the right to construe and pass upon any constitution and conditions designed for the mutual or common welfare of its members which are not violative of sound public law, reason or morality. The right exists, also, within the same broad limits, to legislate, govern, administer, construe and decide for the members in their calling or industry and their dealings and relations with one another arising therefrom within the organization. These rights will be respected and protected by the public courts. If and when such union legislation or acts of government or administration, or any purported construction or decision, transcends reason or morals, or violates public law or rights guaranteed thereunder to the individual members, the courts, their jurisdiction being properly invoked, with equal vigor will hear the cause and safeguard, limit and restrain the illegal act within the bounds prescribed for lawful conduct. The constitution and laws of every labor organization are to be judged and construed in this State and country according to well-conceived ideals and principles of law ordained by a democratic people proud of their heritage and jealous of the protection of their rights of equal opportunity, of voice in the selection of local and general officials, in taxation, the appropriation and expenditure of money for governmental purpose, and of the right and opportunity of assembly and freedom of speech.

All of the issues in this litigation arise out of the language and

provisions of article IV, section 2, of the constitution, general laws and rules of the International Union of Operating Engineers, which reads as follows:

" Section 2. The General President shall countersign all vouchers and checks for payment of moneys or for withdrawing funds from the bank. *The General President shall have the power to appoint officers pro tem, and all committees not otherwise provided for, and to deputize any member in good standing to perform any of the duties of his office which time and distance may prevent him from performing personally. He shall have the direction and supervision of all Local Unions, with power to suspend either individual members or officers for incompetency, negligence or failure in successfully carrying out their duties, and he shall designate the persons to fill the places of officers or members thus suspended who shall conduct the affairs of the Local under his direction.* \* \* \* " (Italics mine.)

The international general president, the late Arthur M. Huddell, under authority of the quoted section 2 of article IV, appointed the defendant Commerford as supervisor of Local Union No. 125 in March, 1929. General President John Possehl, successor to the late General President Huddell, has not revoked, and has accordingly approved and continued such appointment, and Commerford has ever since been such supervisor. As such supervisor Commerford has appointed all the officers of the local union and no election of officers has been held. He has appointed all the delegates and business agents in whose selection the members of the local union have had no voice. He has expended and directed the expenditure of large sums of money and has rendered no account to the members of the local union. Such account, if any, as was made was rendered to an executive committee of his own appointment or selection and to the general president who appointed him. He has suspended or caused the suspension of members of the local union without the formality of hearing or trial, such members being restored to membership only after the injunction issued in the above case by the Appellate Division of this court. He has suspended the holding of the regular meetings of the local union and those for the election of its officers and at such meetings as have been held by his control of the affairs of such members as are permitted to vote, the local union has been prevented from taking any action or vote of members upon the proposition of holding the convention of the international union.

New members have been admitted to the local union without vote of the members. Death benefit funds, formerly kept in a special account, have been intermingled with the local's general funds in the general account. Unemployment relief funds, amount-

ing to $11,766.88 collected, until stopped by injunction, by ten per cent assessment of the wages of employed members and at first placed in special account out of which only $1,597.83 was paid for the relief of unemployed members, have been intermingled with the general funds in the general account. Such general funds for the year 1931 appear to have amounted to $178,079.78. It was conceded that they amounted to at least that much for the year 1930, but an accurate computation could not be made for the reason that the books for that year, an inspection and discovery of which was directed by the Appellate Division, disappeared without any reasonable explanation having been given therefor. From the general funds with the special funds so intermingled, sixty-three per cent was used for salaries and expenses of the supervisor and officers and agents of his appointment; checks totalling $26,140 were paid out for " legal expenses," of which checks for $8,200 were drawn to the order of counsel for the defendants herein, and the balance, regarding which no explanation was made, was drawn by checks cashed by officers, agents or employees at the bank and delivered to the supervisor; checks totalling $2,100, similarly cashed and delivered, were marked " good of local " but otherwise unexplained. Many of the acts and expenditures may be justified, as having the sanction of the general president or an executive committee, or if irregular may not be held illegal since they were those of officers or agents of at least *de facto* standing with the sanction and authority of the international and tolerated if not recognized and supported by a majority of the membership, and many of the acts and expenditures also appear to be those ordinary and usual to the business of the union, or were not shown to be fraudulently expended or otherwise misapplied.

The defendant Commerford, who was available as a witness and in consultation outside of court during the course of the trial with others who appeared and testified, did not himself appear in court and give testimony. Justification was attempted through testimony given by General President Possehl and by that of a general vice-president and member of the general executive board. In the absence of testimony by the defendant Commerford, the one apparently most familiar with the matters at issue, and the principal actor in the transactions under inquiry, and deprived also of such information as might be contained in the missing books, it *must* be held that such explanation and justification were inadequate and incomplete.

That it would be futile to appeal to the international officers or the international general executive board clearly appears not only from the evidence offered by plaintiffs but also from the very

testimony and evidence offered by defendants in explanation and justification. The testimony of the general president was to the effect that he and the general executive board approve supervision, as they interpret that term, of local unions by the international. The general president in his testimony either directly approved or in any event evidenced no disapproval of the acts of the defendant supervisor called to his attention. Then also much testimony and evidence was given by defendants by way of statements and reports by the late General President Huddell to the international convention and the reports of committees therein as well as the action by the convention upon the subject of supervision. The construction placed upon the term " supervision," to paraphrase the language of the report, is as follows:

" * * * The old Constitution provided in Section 2 of Article VII, under ' Duties of the General President ' as follows:

" ' He shall have direction and supervision of all Local Unions with power to suspend either individual members or officers for incompetency, negligence or failure in successfully carrying out their duties.'

" These same words were taken from the old Constitution and placed in the new one, and that is the power under which the General President has put Local Unions under supervision.

" There must be somebody directly responsible for the affairs of the Local Union, and when a Chief Business Agent has been appointed and he has been authorized to appoint the Assistants under him, then, and not until then, was the territory of each of these Local Unions properly covered.

" In every case where a Local Union has been put under International Supervision somebody has been designated to take full charge of the business affairs of the organization and appoint Assistant Representatives to assist them, they have immediately taken on a new lease of life and have conducted their affairs in a business-like manner. * * *

" When these Local Unions were put under International Supervision one man was held directly responsible for the work of the Local Union, and appointed men under him to report to him, then we started to make headway, by getting conditions for the men and in organizing the territories covered by the different Local Unions.

" Where it is found that a local's progress is hampered by an inferior leader, and that the local has amongst its membership one better qualified to successfully transact the affairs of the local, and that he would do so, that man should be recognized by our

General President and placed in charge, and kept there while satisfactory."

The convention approved the report of the general president and his action in respect of supervision in the following language: "Your committee unanimously recommends that the General President be authorized by the convention assembled to use his best judgment in dealing with all such questions that come to his notice.

"That the Constitution has not been changed in dealing with this problem is conclusive, but that in itself would have no bearing on a question of such importance to the general welfare of our organization, where International Supervision becomes necessary either through neglect, stupidity or improper use of the management of the affairs of a Local by those in authority to manage its affairs, the Local should be taken over and placed under International supervision.

"Your committee recommends the approval and authorization of the General President to so proceed."

This report of the committee was adopted.

The foregoing is the construction of the term supervision and of the powers of the supervisor which, from the evidence, the international officers, and the general executive board regard as binding law and final rule of authority. Were they correct, a mere recital of the acts and expenditures by the defendant supervisor and the officers and agents appointed and controlled by him, which have been outlined above, is convincing that the defendant supervisor and those under his control have exercised power going even beyond the boundaries of the unusually broad authority therein stated to have been given.

A reading of the constitution, general laws and rules of the international union clearly demonstrates that such construction is erroneous. Upon this very proposition, and particularly the application thereto of article IV, section 2, the decision in *Rodier* v. *Huddell* (*supra*) states: "This section is clearly limited in its application to the subordinate officers, and authorizes the removal by the president of such officers only for certain enumerated offenses." ["Incompetency, negligence, or failure in successfully carrying out their duties."] (Words in brackets quoted by me from article IV, section 2.)

It should be needless to state, but nevertheless well to bear in mind, that the constitution or organic law as well as the general laws and rules of the defendant union apply with equal force to the union itself, the general president and to the other general and subordinate officers, as to the local unions and the membership.

Supervision would appear to be not more than the visitation by the superior officer, *i. e.*, the general president to the local union, inquiry into and inspection by him of the conduct of the local union by its officers and such members as are selected as agents and committeemen to carry out the business of the union, investigation of questionable acts and expenditures and upon finding that any is contrary to the constitution, general laws and rules the requirement of a change of conduct in conformity therewith. Within the limitation noted above it would appear that for the enumerated offenses the general president has power to suspend and possibly to remove officers and to fill the temporary vacancy. This appears to be the power which the general president is given in article IV, section 2. Nowhere is any such office as supervisor created or provided. Such a person must then either be a member deputized to perform some of the duties of the general president, or an officer *pro tem*, or a person appointed to fill the vacancy of a suspended officer. Enforcement by the general president of his power of direction and supervision can only be had in the manner provided by the constitution and general laws. He may enforce and require observance of his supervision and direction in the manner provided in article IV, section 2, *i. e.*, by suspension of the officer, until removed on charges after hearing and by designation of the person to fill the place or by suspension of the charter of the local union until a hearing is had before the general executive board or the general president, or other designated member of the board under article VII, section 6, and article XV, sections 2 and 3.

Under the constitution and general laws the organization consists of local unions, local joint executive boards, State branches, and members subject to its laws (Art. 2), for the object among workers of obtaining the proper position of the craft; among members of encouraging greater skill, cultivating friendship, assisting in securing employment, reducing hours of labor, securing higher wages and elevating moral, intellectual and social conditions (Art. 1). The organization, then, while it is a society of workingmen, is particularly the vehicle by which the members as workingmen operate to attain their objects as such through the parent organization and the local unions. The organization is the form and means by which the members seek their desired ends and stated objects. Leaders may voice the aspirations, mold the formative opinions, express the inarticulate desires and press on in advance of the members for the realization of the ideals and concrete objects of workers. Officers are essential and their services highly desirable. They are, however, not more than the responsive agents of the members, in and for the performance of such acts as by consent

or express direction it is necessary for the members to have done through representatives. If they go beyond prescribed bounds their acts become usurpations and detrimental to the union and the members. Conventions are to be held quadrennially (Art. 3) pursuant to a referendum vote of the members, and the question, if it is answered in the negative, is to be repeated annually until a convention is held. The general president is strictly accountable and responsible for the faithful performance of his duties (Art. 4, § 3). Many of the acts done and the expenditures of money by the so-called supervisor appear, then, to be a taking over of the functions which are, by the constitution and general laws as well as by the laws and rules for the government of local unions, resident in and intrusted to the local unions or the officers or the members thereof. Several instances show the extent to which the so-called supervisor or those appointed by him are exercising powers which, by the constitution and laws, are given exclusively to the local unions or the elected officers, or the members. Election of delegates is to be held at the regular elections of officers in June prior to convention (Art. 3). The election of officers is to be held at the last meeting in June, the nominations to be held at the regular meeting prior to the election, and the installation is to take place at the first regular meeting in July (L. & R. for G. of L. U. art. 1, § 3). Such officers are to serve for twelve months (§ 2). Vacancies occurring in any local union office are to be filled at the next regular meeting (§ 4). The recording secretary is to send a list of all new officers to the general secretary-treasurer (§ 6). If any officer fails to discharge the duties of his office for two successive meetings the office may be declared vacant and an election to fill the same shall take place at the next regular meeting (§ 7). Although this local came into existence in March, 1929, and three years have now elapsed, none of these requirements has been observed, the officers and agents having been selected or appointed by the so-called supervisor. The treasurer may make no disbursements without the sanction of the local union upon an order signed by the president and recording secretary (L. & R. for G. of L. U., art. 2, § 5). The trustees shall have the supervision of all the funds and property of the local union subject to such instructions as they may receive from time to time from the local union (§ 8). On the contrary, the sanction of expenditures and the supervision of funds and property seem to have been under the control of the supervisor. In respect to the admission of members, article 14 of the constitution and general rules provides a regular application must be signed by the applicant and certified by two members in good standing and filed with the recording secretary (§ 5).

The application shall be referred to an investigating committee which must report not later than the next meeting (§ 8). In voting upon the application ball-ballot shall be used and it shall require a majority vote of all members to reject a candidate. All members must vote or be counted with the majority. This was not done, but by direction of the supervisor members were admitted through a committee of investigation of his selection. The foregoing provisions indicate that the affairs of local unions are to be transacted by officers elected by the membership of the local unions, and the members shall by vote and voice select their own officers, control the expenditure of their own moneys, the performance of their own local functions and obligations, and the admission of new members.

It appears clear the provisions of article 7, section 2, that the general executive board shall have all the powers of and concurrent with local unions, and article 4, section 2, that the general president shall have full control of the work of the organization subject to the approval of the general executive board, and shall have power to appoint representatives in such localities as shall appear to be for the interest of the organization, may be harmonized with the other provisions, many of which are quoted above and which provide for the control and operation of local unions by the officers and members thereof. The general executive board might exercise general powers of a similar character to those specifically given to local unions and their officers, in all instances where jurisdiction of a broader character was involved although the territorial limits were local and local power and jurisdiction appeared inadequate to cope with the matter involved or where the exercise of power was deemed supplementary to the specific authority in the local union and necessarily done for the attainment of the objects of the organization. The power of the general president referred to must, of necessity, be of the same broad, general character unless specific power is expressly given in words so clear that unmistakably the president is authorized to take over the functions, duties and obligations of local unions or their officers. Representatives appointed by the general president would appear to be such as would function for him or the parent organization, and under no circumstances would the appointments of officers *pro tempore* or any agent or official of a local union last beyond the specific time designated in the constitution and laws for the election of the officers of the local unions. That this is so seems clear from and is emphasized by a very specific reservation contained in the constitution providing that delegates at a convention cannot alter,

amend or change any proposition adopted by a referendum vote of the membership. In so far as the evidence in this case shows, it appears also that the constitution and general laws, as well as the laws and rules for the government of local unions, were adopted by a referendum vote of the membership. A conclusion that the general president and/or the executive board have greater powers than the delegates elected by the membership to represent them and the local unions in convention does not appear reasonable. The conclusion that a so-called supervisor, who at most is a representative of the general president, and not directly named in the constitution and general laws, has greater powers than such delegates, and than those apparently given to the general officers, including the general president, has no support in fact or union enactment. Even the general secretary-treasurer, who next to the president appears to hold the most influential position in the organization and whose full powers appear to be confined to the provisions of the single article 6, and who, among other duties, " shall make a full report of all matters relating to his office, his official acts and work, to each convention, the amount of monies received, disbursed and balance on hand, and where deposited * * *," and whose " books and affairs shall always be open for inspection by the general officers," has less power than that exercised by the so-called supervisor. I am of the opinion that the constitution and laws of the International Union of Engineers never contained, nor was it ever contemplated by the members of the union that they would contain, the autocratic and dictatorial powers which it is asssterted are possessed thereunder by a so-called supervisor appointed by the general president. Various reasons are generally given for supervision, such as lack of business methods in the administration of the affairs of the local union, graft and strife among officers and business agents, calling improvident strikes, unreasonable difficulties and differences with employers, and lack of organization of local union territories. None of these was shown to exist prior to, at the time, or subsequent to the appointment and activity of the supervisor. The evidence does not show the existence of such reasons in this union or among plaintiffs who are members thereof. It, therefore, appears to me from all the evidence that the plaintiffs are entitled to judgment.

Appropriate findings and interlocutory judgment may be submitted on notice.