Bernard C. Madden et al., Appellants, *v.* Charles T. Atkins, Individually and as President of New York Association No. 88 of Masters and Mates of the National Organization Masters, Mates and Pilots of America, Inc., and as President of National Organization Masters, Mates and Pilots of America, Inc., et al., Respondents.

Second Department, May 6, 1957.

2

*John R. Harold* for appellants.

*Francis X. Nestor* and *John P. Gorman* for respondents.

WENZEL, J.   Respondent National Organization Masters, Mates and Pilots of America, Inc., a domestic corporation, hereinafter referred to as National, is a trade union whose activities extend generally throughout the country.   Affiliated with it are subordinate trade union organizations whose activities are generally confined by territorial limitations.   The subordinate organizations operate under charter issued by National. Respondent New York Association No. 88 of Masters and Mates of the National Organization Masters, Mates and Pilots of America, Inc., an unincorporated membership association, hereinafter referred to as Local, is one of such subordinate organizations.   Membership in the subordinate organization is limited to government licensed masters, mates and pilots of ocean and inland vessels.   Collective bargaining agreements have been made by National for the benefit of members of the subordinate organizations with many steamship companies, that is, employers of such ship officers, in which agreements National is recognized as the sole representative of the deck officers of the contracting steamship companies and in which it is required that employment of deck officers other than captain (master) or chief officer shall be processed " through the offices of " National in the port where the vacancy of position in question exists.   Local operates in the port of New York.

In 1953 the five appellants other than Di Pietrantonio were expelled as members of Local, and they and appellant Di Pietrantonio, who is a member of another such subordinate organization, one operating in another port, were denied further work opportunities through the said offices in the port of New York. They brought this action to compel restoration of the said expelled appellants to the status of members in good standing and the former status of all appellants with respect to work opportunities.   The questions presented are all, or virtually all, those which might be raised in an action such as this and which may generally be stated to be those concerning the jurisdiction of the court to review the matters complained of; the power of an unincorporated membership association to expel members; the regularity, propriety and fairness of the pro-

cedures provided for and employed by the association, and pecuniary damage.

If the constitution and by-laws of an unincorporated association reasonably provide that " the performance of certain acts will constitute a sufficient cause for the expulsion of a member, and that charges of their performance, with notice to the member, shall be tried before a tribunal set up by the association, the provision is exclusive, and the judgment of the tribunal, rendered after a fair trial, that the member has committed the offenses charged and must be expelled, will not be reviewed by the regularly constituted courts " (*Polin* v. *Kaplan*, 257 N. Y. 277, 282). In addition to such expressly stated causes for expulsion, there is an inherent obligation on the part of each member of such association loyally to support the association in the attainment of its proper purposes and an implied right in the association to expel a member for gross breach of this obligation or for commission of some infamous offense or an act tending to the destruction of the association (*Polin* v. *Kaplan, supra,* pp. 282–283).

Further, even assuming *arguendo* that a given expulsion was without basis, the court will nevertheless refrain from interfering unless and until the aggrieved member shall first have exhausted his remedies within the association (*Browne* v. *Hibbets,* 290 N. Y. 459, 465; *Havens* v. *King,* 221 App. Div. 475, affd. 250 N. Y. 617), unless the further remedies are inadequate or would require the aggrieved person " to make continued futile efforts beyond a reasonable time within which to obtain relief ", particularly if the expulsion has left him without means of subsistence (*Browne* v. *Hibbets, supra,* p. 466; cf. *Matter of Brown* v. *Supreme Court of the Ind. Order of Foresters,* 176 N. Y. 132, 138).

The constitution of National and that of Local contain similar, although not identically worded, provisions prescribing the procedures for prosecution of charges against a member (National Const., art. X, § 8; Local Const., art. IX). The provisions are that such charges shall be presented to Local, in writing and signed by a member-complainant; that the charges shall be tried by a trial committee of seven members elected for the purpose; that the trial committee shall render its findings and judgment in writing to a regular meeting of Local, which findings and judgment shall be final unless changed or rejected at that meeting; that the main points and the testimony given and the findings and judgment shall be kept on file by Local's secretary for purposes of appeal, and that a member convicted of an

offense against Local may appeal first to Local's executive board, second to National's executive board and third to the national convention of National.

Separate written charges were preferred against each of the appellants other than Di Pietrantonio, and each was tried separately thereon before the particular trial committee elected in each case. All the charges pertained to claimed activities which were related to the regular election of officials of Local in the Fall of 1952 and to certain further claimed activities which began shortly after that election. A slate of candidates in opposition to the incumbent officials had been presented prior to that election, including appellants Liddy, Polachek and Madden, respectively, for president, first vice-president, and second vice-president. The opposition slate did not succeed, and after the election a group of Local's members, including appellants, formed, or at least participated in the activities of, or made contributions to, a body which used for its name '' American Mariners Association of the National Organization Masters, Mates and Pilots of America '', hereinafter referred to as AMA.

The charges against appellants Madden and Liddy were identical. They were presented to each at Local's regular meeting on February 25, 1953 and, generally stated, accused each of violating his obligation as a member of Local and National; participating in creating a '' dual union '', that is, AMA; advertising the dual union in *Labor Leader* (a periodical published by Association of Catholic Trade Unionists) ; attending, inviting other members of Local to attend, and permitting persons who were not National or Local members to attend, '' unauthorized meetings ''; participating in distribution of '' smear sheets '' during the campaign prior to the said 1952 election, and issuance of a written statement '' that they intended to advocate mass withdrawal from the local, dues strike, and dual unionism ''. The meeting then went on to the matter of electing a trial committee to hear both sets of charges. Respondent Atkins, as Local's president, was presiding but turned the chair over to Shea, a vice-president. According to the minutes of the meeting, members Marshall, Barlow, Goode, Marthey, Scavo, Mitchell and Diaz were nominated (no record was made as to whether there were any other nominations) and elected by a vote of 41 to 19. However, at the trial of this action testimony was given that 10 to 12 names in all were offered in nomination, including 8 other than those named in the minutes, and that 6 of those 8 unrecorded names were among the first 7 who were in fact nomi-

nated; that what happened was that Shea simply announced that a motion was carried accepting the 7 names which Atkins had stated were the first 7 to be nominated, and that, in addition, Marshall and Diaz were not nominated at all or even included in the 7 names announced at that time by Atkins, but were later substituted by an unstated means for 2 names that Atkins had announced.

In addition, Barlow, Marthey and Mitchell were paid employees of Local. They had been given their paid positions by Local's executive board, every member of which board had been the subject of excoriating criticism in behalf of the opposition slate in the campaigning prior to the 1952 election, and this criticism against them generally and against at least some of them specifically was thereafter continued through the agency of AMA.

Trials on the charges proceeded before the committee composed as set forth in the minutes, as to Madden on March 4, 1953, and as to Liddy on March 6, 1953, after both these appellants unsuccessfully protested against being tried by this committee. The committee rendered a report to Local's regular meeting on March 11, 1953, finding both of them guilty of violation of " their obligation as members of Local 88 as charged, and of dual unionism as charged " by a 5 to 2 vote; finding them guilty of " being a party to the smear sheets sent out and distributed in the election " by a 4 to 2 vote, and for expulsion of both by a 5 to 2 vote. The report was adopted at the meeting by a vote of 51 to 42.

The charges against appellants Polachek and Sohnen were that each was guilty of " conduct unbecoming ", and of " violating his obligation as ", a member, and specifications as to each were also set forth. Specifications common in both sets of charges were that each had participated in creating a dual union, AMA; had attended unauthorized meetings of, or meetings in promotion of, AMA, and had participated in distributing smear sheets. Specifications against Polachek alone were that he had violated a certain stipulation which he had signed in 1947; had sworn falsely in an affidavit in a certain lawsuit against Local; had participated in sending out a statement advocating mass withdrawal from Local, a dues strike and dual unionism, and was inciting Local's membership to join AMA. Specifications against Sohnen alone were that he had refused to carry out his duties as a member of the 1952 election committee; had unjustly commenced the lawsuit mentioned in the Polachek specifications; had conspired with and taken orders from the opposition slate, nominating three of its candidates; had falsely accused

some of Local's officials of fraud in the election and participated in printing that accusation in *Labor Leader*; had attempted to sabotage the election; had distributed AMA's circulars aboard a certain ship; had accused Atkins and Local's vice-president Herzer of having obtained their licenses by fraud, and had attempted to create dissension within Local by declaring that certain steamship lines would sign contracts with persons not representing National.

The charges against Polachek and Sohnen were preferred at Local's meeting on March 25, 1953. At the same meeting a resolution was adopted condemning the creation of AMA, demanding that charges be preferred against any Local member who becomes or has become a member of AMA, and recommending to any trial committee that any Local member be expelled if found to be a member of AMA.

Separate trials of these charges were had early in April of 1953 by a trial committee different from the one that had tried Madden and Liddy, and this committee reported to Local's meeting held on April 22, 1953 that by a vote of 5 to 1 it found Polachek " guilty as charged on all counts, except one " (without specifying which charges were deemed proved) and determined that he be expelled, and that by a vote of guilty on all counts as to Sohnen, 6 to 0 on some and 5 to 0 on others, it was determined that Sohnen be expelled (one elected committeeman not participating). The said meeting concurred in the expulsions by a 45 to 23 vote as to Polachek and by a 47 to 19 vote as to Sohnen.

The charges against appellant Friedman were presented at Local's meeting on May 13, 1953. They were that Friedman had violated his obligation as a Local member in that he was a member of the " dual union ", AMA; was editor of AMA's periodical, and was responsible for distribution of that periodical in front of Local's building and for sending it to certain Local members. He was tried by a third trial committee on May 20, 1953 and this committee's findings relied on two letters, one by the secretary and the other by the president of National, dated respectively March 9 and March 11, 1953. The secretary's letter expressed an opinion that it was necessary to order the leader of AMA " to cease and desist ". The president's letter purported to interdict all members of Local and any other local of National against attending meetings of, or participating in, AMA, and it characterizes AMA as a " dual organization ". It should be noted that the president of National was respondent Atkins himself. He was president of both National and Local. Returning to the matter of the findings of the trial committee,

they were that AMA and its members constituted "a dual organization in violation" of the two said letters and that therefore the committee ruled Friedman guilty by a 5 to 0 vote and recommended his expulsion in accordance with the March 25th resolution (two elected committeemen not participating). The committee's report also contains a tabulation of votes upon charges listed only by numbers 1 to 5, inclusive, which indicates, in our opinion, that Friedman was found not guilty of the charge of distributing the AMA periodical in front of Local's building. A meeting of Local on May 27, 1953 concurred in the report by a vote of 43 to 12.

Madden and Liddy appealed to Local's executive board and on April 27, 1953 that board denied their appeals in separate written decisions which referred to the March 25th resolution and stated, as the ground of decision, that one of the charges of which these appellants had been found guilty by their trial committee was their membership in AMA.

Madden and Liddy then wrote to National's secretary stating that they wished to appeal to National's executive board, but neither received any word from National concerning his appeal, and they did not appeal to the national convention. There was testimony that a convention was held in May, 1954 in Philadelphia (respondents' brief states that it was held in Mobile, Alabama).

Polachek and Sohnen appealed to Local's executive board, and Atkins, as Local president, advised them in June, 1953 that a time for hearing their appeals could not be fixed because a quorum of the board, exclusive of the member who had preferred the charges against them, was not available. Polachek and Sohnen heard nothing further with respect to their appeals until they were notified in the following November, after commencement of this action, that their appeals would be heard on a stated day that month. Thereafter their appeals were determined adversely to them. Neither took any further steps with respect to appeals. Sohnen testified at the trial of this action that the reason he sent no communication to National's executive board was that that board had failed to act in the Madden and Liddy cases and that he did not know until the trial of this action that there was a national convention in May, 1954.

Friedman's appeal to Local's executive board was decided against him on June 16, 1953 by written decision similar to that board's decision in the appeals by Madden and Liddy. The next day he wrote to National's secretary, stating that he thereby appealed to National's executive board. The secretary answered on July 14, 1953 stating that no meeting of that board

was scheduled for the "very near future" and referring to sections 2 and 3 of article VI of National's constitution (§ 3 provides that no case may be accepted by a member of National's executive committee "unless it comes to them through the Local" or certain "District" officials). Friedman did nothing further with respect to appeals.

We are in agreement with the learned Justice at Special Term that the expelled appellants did not exhaust the remedies provided for them within the framework of National and Local. As to Polachek and Sohnen, their appeals to Local's executive board were admittedly still pending and unheard when this action was commenced, and they made no attempt to appeal to National's executive committee or to the national convention. Madden, Liddy and Friedman, in failing to initiate their appeals to National's executive committee through Local or the district officials as required by section 3 of article VI of National's constitution, rendered their attempted appeals to that committee ineffective, and they made no attempt to appeal to the national convention.

However, the evidence puts this case within the exceptions to the general rule, which exceptions we have noted above upon the authority of *Browne* v. *Hibbets* (290 N. Y. 459, *supra*) and *Matter of Brown* v. *Supreme Court of the Ind. Order of Foresters* (176 N. Y. 132, *supra*).

The further remedies within the framework of the respondent organizations were, as above stated, at the hands of Local's executive board as to Polachek and Sohnen, and in the forums of National's executive committee and of the national convention as to all the expelled appellants. The executive board of Local consisted of Local's president, two vice-presidents, a secretary-business manager, and three trustees, all elective officials, four of whom constituted a quorum (Local Const., art. III, § 1; art. VI, § 1). We have hereinabove alluded to the criticism to which these board members had been subjected in the 1952 election campaign and by AMA. It was this very criticism which made up the bulk of the charges against the expelled appellants. Thus, what confronted Polachek and Sohnen on their appeals to Local's executive board was the fact that those appeals would be decided, as in the case of the appeals to that board by Madden, Liddy and Friedman, by men who had been victims of such criticism. The executive committee of National consisted of all its elective officers, the president and 10 others, 5 of whom constituted a quorum (National Const., art. V, § 1; art. VI, § 1). It will be remembered that Atkins, one of the very persons who

had been a victim of the criticism just above mentioned was National's president. All actions taken by National's committee between conventions of National must be submitted to the next convention for approval (National Const., art. III, § 2).

As to whether appeals to bodies composed of personnel who are related as above indicated to the appealing persons and the actions of the latter which resulted in the expulsions ought to be considered futile, we need but quote from *Rodier* v. *Huddell* (232 App. Div. 531, 533) : "A suspended member is not required to pursue his remedy by appeal within the organization when such appeal is to a board so constituted as to afford no likelihood of an impartial hearing." (See, also, *Wilcox* v. *Supreme Council of the Royal Arcanum,* 210 N. Y. 370; *Corregan* v. *Hay,* 94 App. Div. 71.) Further, insofar as appeals to National's executive committee and to the national convention are concerned, it appears without question that such appeals would not be resolved within a reasonable time and would entail considerable expense to the expelled appellants, bearing in mind particularly the distances between their place of residence, New York City, and the places where appeals by them on National's level would be heard (*Matter of Brown* v. *Supreme Court of the Ind. Order of Foresters,* 176 N. Y. 132, *supra; Corregan* v. *Hay, supra*). In this connection it must be remembered that in the meantime, because of the expulsions, these expelled appellants had been without the benefit of employment at their regular vocations.

Having concluded that the court has jurisdiction, the next task is to consider whether the evidence adduced before Local's tribunals supports the findings of the said tribunals as to the acts which were committed by the expelled appellants, whether it was within the power of Local to impose expulsion as the penalty, and whether Local accorded the expelled appellants fair trials and fair consideration in the further procedures within its framework.

The statements of the trial committees which may be said to constitute the findings of the committees as to what acts were committed by the expelled appellants are not set forth in all the cases in a manner which would enable the court to understand with certainty which of the charges were found by the committees to have been established. However, it is not to be expected that the charges and findings written by members of organizations in disciplinary proceedings such as these will meet the standards which are required of charges and findings made in a court of law, and the court should not defeat such proceedings on the mere ground of inadequacy of the form of

the charges and the findings, so long as substantial rights are preserved (cf. *People ex rel. Johnson* v. *New York Produce Exch.*, 149 N. Y. 401, 413).

In the case of Sohnen, the findings clearly state that he was guilty of all charges against him. In our opinion, Madden and Liddy were also found guilty of all charges against them. In Friedman's case we have already stated that he was exonerated of the charge of distributing the AMA periodical in front of Local's building and found guilty of all the other charges against him. In the Polachek case it is impossible to be certain that this appellant was not absolved of any particular charge, since the findings did not identify the charges of which he was found guilty and the charge of which he was exculpated.

In none of the cases do the statements of charges and the findings in and of themselves depict all the acts found to have been committed in such manner as to enable the court to determine from those bare statements whether Local had power to expel for commission of the acts in question. Review of the evidence adduced before the trial committees is accordingly essential for this reason in addition to the need to consider whether the findings are supported by the evidence. For this purpose we shall include reference to evidence on all the charges against Polachek as to "smear sheets" and AMA, since we cannot identify the charge of which he has been exonerated, but shall omit the evidence as to the charge of which Friedman was exonerated.

We are in agreement with the trial court that the court was not limited to the incomplete written transcript of the testimony adduced before the Madden-Liddy trial committee and that it was proper for the court to accept evidence which purported to complete the proof as to what the evidence before the said trial committee was.

Disciplinary proceedings before a tribunal of a membership organization may be compared to such proceedings before quasi-judicial bodies, and the rule in the latter proceedings that technical rules of evidence which obtain at a court trial are not applicable (see *Matter of Roge* v. *Valentine*, 280 N. Y. 268, 278–279; *Matter of Reynolds* v. *Triborough Bridge & Tunnel Auth.*, 276 App. Div. 388, 390) should control in the former. As was written in *Reynolds* (*supra*, p. 390): " All that is required is that there be a ' residual ' of competent evidence of probative force so substantial as to support the determination of the agency ". The court, in reviewing the evidence upon which the organization reached its conclusions, does not do so for the purpose of considering whether it ought to substitute its own

conclusions with respect to the facts in place of those of the organization, but only to determine whether there was " a total absence of evidence to support the sentence of expulsion ", " whether the case was so bare of evidence to sustain the decision that no honest mind could reach the conclusion " that the conduct of the members in question warranted expulsion (*People ex rel. Johnson* v. *New York Produce Exch.*, 149 N. Y. 401, 410, 414, *supra*; see, also, *Lewis* v. *Wilson*, 121 N. Y. 284; *Young* v. *Eames*, 78 App. Div. 229, affd. 181 N. Y. 542).

The so-called " smear sheets ", briefly described, are as follows: Exhibit 11-E is a lengthy diatribe printed on a single sheet of paper. With obviously intended sarcasm it is styled as a message from the incumbent officers in connection with the then coming 1952 election and is addressed: " To The Saps That Belong To The MMP Local 88 ". At its foot is the legend: " Copy To All Locals, Steamship Companys [sic], Coast Guard And All Ships ". Its text mainly depicts Atkins as one who had risen from the role of " body-guard " and " goon squad leader " to president, " taken " the organization financially, been a Communist party member, used his office for various stated ulterior and dishonest purposes, procured his master's license dishonestly and who had resorted to fraud in previous elections and would do so in the current election. It also describes Local officials Herzer, Martin and Oliver as dishonest.

Exhibit 11-F is a small strip of paper, the text of which, in typewriting, states that Martin and Atkins have refused " to sponsor an honest election and a true itemization of our local's funds " and have used "goon squads and terroristic activities and * * * smear tactics " which " leaves us with no other alternative then [sic] to meet them on the same grounds "; that " Many members at present are advocating mass with-drawal from the local, dues strike, dual unionism and boycott of our patrolmen unless the situation within our local is remedied ", and that National's executive committee ought to intercede.

Exhibit 11-G is a printed leaflet of four pages, dated November 24, 1952, and addressed to Local's members. Its text is an attack on the incumbent officials and their candidacy in the 1952 election, similar to that of Exhibit 11-E, and a plea for votes for the opposition slate and contributions to that slate's campaign.

Exhibit 65-D is typewritten. Its text is the same as that part of Exhibit 11-G which refers to Atkins.

These exhibits were not involved in the charges against Friedman. Only the other expelled appellants were concerned with them. No evidence whatsoever was adduced to connect any

of these appellants with Exhibit 11-F or to connect Madden or Liddy to the others of these exhibits. We do not regard bald accusations made by witnesses with reference to these exhibits as testimony that events in fact occurred. However, the evidence does support the findings as to these exhibits to the extent that Polachek and Sohnen bear a responsibility for Exhibit 11-G, and that Polachek bears a responsibility also for Exhibit 65-D. At Local's trial of Polachek, Martin and Atkins testified that on November 13, 1952 Polachek and another (Taft, the opposition candidate for secretary-business manager) met with them, gave Atkins Exhibit 65-D, said that they were speaking for the opposition slate and its supporters and that unless Atkins agreed to certain demands concerning the impending election the exhibit would be circulated; this was corroborated by a letter written by Taft, and Marshall also testified that in the middle of November, 1952, at Local's hall, Polachek gave several copies of Exhibit 11-G to a member who, in turn, gave one to Marshall. Marshall also testified at Sohnen's trial that Sohnen also offered him a copy of Exhibit 11-G a day or two later, after having told him, three days before that, that the sheet was to be distributed.

Turning to the evidence as to the charges dealing with AMA, namely, its creation, membership in it, its character as a " dual union ", its meetings, its writings and publications of items concerning it, there was ample proof to connect all these expelled appellants with AMA and its activities generally. Appellants do not contend to the contrary. However, the only probative evidence offered on the subject of whether AMA and its activities could be deemed offenses against Local seems to be the writings which AMA issued. According to Madden's undisputed testimony at the trial of this action, what was probably the first item was issued prior to February 9, 1953. It is a single sheet of paper, captioned " True Course " and signed by Madden and Liddy " For The Founding Committee ". It announces the formation of AMA, indicates that AMA is a group which will function as a " party " within Local and thereby create " a two party system " in Local, expresses the opinion that two parties within the union " working for and in the interest of the Union and the membership, will be a good and healthy thing for our Local ", and invites members of Local to associate themselves with AMA. It further states in effect that AMA will be a forum for the free expression of ideas " within the framework of the Union, to guide the welfare of the Union in a beneficial way " and that AMA " cannot and will not be permitted to be a dual Union " and " must never speak in the name of the Union, seek to handle grievances or

Union jobs, deal with the Employer, or propose or seek to cause a membership to ever disaffiliate from Local 88." Thereafter, under date of February 9, 1953, Madden submitted a similar written statement to the editor of Local's periodical for publication. Subsequently AMA published and circulated a periodical of many successive issues covering an extended period of time, styled *True Course,* in all of which there was sharp criticism of the conduct of Local's officials in their office and of the conduct of the disciplinary proceedings and action of Local against appellants; they also generally exhorted members of Local that support of AMA was needed for the welfare of Local.

It might be noted, although this is not of importance in determining the litigation, that, according to the dates of the various issues of *True Course,* none of the issues of that periodical was published prior to the trial of Madden and Liddy, except the first issue, which announced the creation and purposes of AMA.

We shall make no reference to the further evidence which was presented with respect to the charges pertaining to the " smear sheets ", to AMA or to the other charges. The further evidence has no probative value, or at least such slight weight that it does not affect our determination, or would be merely cumulative, or pertains to trivial matter.

Having given meaning to the findings of guilt with respect to the charges dealing with the " smear sheets " and AMA by the foregoing review of the evidence, it becomes necessary to juxtapose those findings with the requirement that the constitution or by-laws of National or Local must contain a provision that expulsion is the penalty for such guilt, and with the further requirement that, if there be such provisions, they must be reasonable, or if there be no such provisions, that the expulsions must be in the exercise of the organization's implied right to expel for gross breach of an inherent obligation loyally to support the organization, for commission of an infamous offense, or for an act tending to the destruction of the organization (*Polin* v. *Kaplan,* 257 N. Y. 277, *supra*).

The constitutions of National and Local and the by-laws of Local do not provide that acts such as those of which the expelled appellants were found guilty are offenses against National or Local or prescribe punishment for commission of such acts. Even if the resolution adopted at Local's meeting on March 25, 1953 could be regarded as an efficacious express rule of Local on the basis of which expulsion might be regarded as the prescribed penalty for membership in AMA, it ought

not to be applied against Madden and Liddy. It was not adopted until after they had been tried and their trial committee had rendered its findings and judgments. In cases such as these the court will not countenance an expulsion " contrary to natural justice " (*Young* v. *Eames,* 78 App. Div. 229, 241, *supra*), and in our opinion ex post facto application of this resolution would be " contrary to natural justice ".

In any event, we cannot permit the resolution to be the basis of any expulsion by Local, not only as against Madden and Liddy but also as against Polachek, Sohnen and Friedman. We echo the well-stated views of Mr. Justice HAMMER in *Irwin* v. *Possehl* (143 Misc. 855, 858) : '' If and when such union legislation or acts of government or administration, or any purported construction or decision, transcends reason or morals, or violates public law or rights guaranteed thereunder to the individual members, the courts  *  *  *  will  *  *  *  safeguard, limit and restrain the illegal act  *  *  *. The constitution and laws of every labor organization are to be judged and construed  *  *  *  according to well-conceived ideals and principles of law ordained by a democratic people proud of their heritage and jealous of the protection of their rights of equal opportunity, of voice in the selection of local and general officials, in taxation, the appropriation and expenditure of money for governmental purpose, and of the right and opportunity of assembly and freedom of speech.''

We also subscribe to Mr. Justice HAMMER's views in *Ames* v. *Dubinsky* (5 Misc 2d 380, 412) that union officials, by offering themselves as candidates for office or re-election, subject themselves to fair comment as to their '' character for honesty and integrity and [their] qualifications and fitness for the office '', which comment is protected by privilege in the utterances of false statements published in good faith and without malice.

The same reasoning is, of course, applicable to all acts of a membership association, including expulsions of members on grounds not set forth in written laws of the association as constituting offenses against the association.

In *People ex rel. Meads* v. *Alpha Lodge* (13 Misc. 677, affd. *sub. nom. People ex rel. Meads* v. *McDonough,* 8 App. Div. 591) one of the purposes of the membership organization in question was to give pecuniary benefits to its members. It was held that charges that a member of such an organization had maliciously assailed officers of the organization through the public press, accusing them of various reprehensible acts, including crime and mismanagement in connection with the affairs of the organization, were insufficient to justify his

expulsion, and pointed out that the remedy of defamed members was to seek damages against the offending member and not his expulsion. The court distinguished the defendant organization from a purely social club, where expulsion for annoying or offensive conduct might be justified, and further distinguished slander against individual members from slander against the organization itself.

In *Wilcox* v. *Supreme Council of the Royal Arcanum* (210 N. Y. 370, 379, *supra*) in which an expulsion from a fraternal membership organization upon similar grounds was upset by the court, the Court of Appeals indicated that it could be found that publication of the accusations of graft, fraud and dishonesty on the part of officials of the organization was made '' in the discharge of the highest duty of the order [the organization], and that the temporary injury [to the organization] resulting from the exposé of wrongdoing was more than offset by the permanent good.''

Exhibit 11-G was an utterance which did not go beyond the limits of fair comment in an election campaign. Although its text was strong and even defamatory, that is not abnormal in such struggles for power in a membership organization, especially a trade union. If an opposition slate of candidates is not to be granted a reasonably free hand there would be little chance to bring corruption to light. We cannot accept the doctrine that the court is bound to accept the organization's findings to the contrary and may not protect a militant minority from recrimination for its exercise of its fundamental and natural rights.

Exhibit 65-D, the draft copy of part of the ultimate leaflet (Exhibit 11-G), and the use to which it was put by Polachek (as a threat in order to induce the cancellation of the impending election and the commencement of a new election) may not be condemned for the same reason.

These were the only so-called '' smear sheets '' which were connected with any of the appellants. However, had there been a proven connection with Exhibit 11-E, the same treatment would be given it.

So far as AMA, its activities and those of the expelled appellants through it are concerned, we find that it was not AMA's purpose, and AMA was not used, to weaken, undermine, destroy or compete with National or Local, or to have separate existence as a union, but rather that AMA was intended and used as a unit in which members of Local could have free interchange of ideas and by which they could marshal their forces as a possible potent agent for good in the organization. AMA and

its members had the same right of expression with impunity as did the opposition slate in the 1952 election campaign, and what has been said above in connection with Exhibit 11-G with respect to the function of the court is likewise applicable to the subject of AMA.

The fact that a majority of members present at meetings of Local upheld the expulsions and adopted a resolution condemning AMA and its members is irrelevant. The point is that minorities must be protected against punishment for exercising their basic rights. The resolution must be swept aside as unreasonable and as an invasion of such rights.

It is therefore our conclusion that the expelled appellants are entitled to judgment directing that they be reinstated as members of Local and that all rights as members thereof be restored to them.

Madden and Liddy are entitled to such judgment not only on the ground that the evidence could not be said to connect them with any of the " smear sheets " and the further grounds above stated with reference to the nature of Exhibits 11-E, 11-G and 65-D and to AMA generally, but on the further ground that there is grave doubt that the election of their trial committee was entirely fair and that all the members of that committee were impartial. We have already stated the facts as to that election and the possible partisanship of three members of the committee who were paid employees of Local. In addition, the impartiality of committee member Marshall is subject to question on the further ground that he was a witness against Polachek and Sohnen and signed and prosecuted the charges against Friedman.

The common requirement that all parties are entitled to a trial by impartial judges must be enforced by the court with particular zeal in a case such as this where the court's power to review is so circumscribed that it may be compared to its function in reviewing an award in an arbitration proceeding. As to arbitration proceedings, it has been said: " Nothing should be permitted to throw suspicion even upon the entire impartiality of arbitrators. The finality of an award of arbitrators as compared with the reviewable decision of a judge or a referee makes this all the more important, and that the tribunal which is to pass upon the rights of the parties be not subject to the slightest suspicion as to its fairness " (*Matter of Friedman* [*Friedman*], 215 App. Div. 130, 136); and that an award will be vacated if it is " tainted by partiality or interest of an arbitrator " (*Matter of Lipschutz* [*Gutwirth*], 304 N. Y.

58, 65). This rule of extreme caution as to impartiality of judges was, as a matter of fact, applied in a proceeding for reinstatement of a member in a membership organization, the subject member having been expelled because, as in the instant case, he had defamed officials of the organization (*Wilcox* v. *Supreme Council of the Royal Arcanum*, 210 N. Y. 370, 380, *supra*). In that case it was written: '' It is shocking to one's sense of fair play that persons defamed should be selected to try the defamatory charge, and it is sufficient for the purposes of this case to hold that they are disqualified by a direct interest in the subject-matter of the controversy.''

In addition, it seems to us that all the expelled appellants are entitled to relief on the ground of lack of impartiality in the hearing of their appeals to Local's executive board. They were entitled to have not only their trials, but also their appeals, held and determined by impartial judges. We have hereinabove shown, in connection with the question of whether the court ought to take jurisdiction of this matter, that every board member who participated in the appeals had been a victim of the defamation involved in the charges against the expelled appellants. What was said in *Wilcox* (*supra*) as to the selection of judges for trials such as these may equally be applied to judges on the appeals. The fact that there were no members of the board who could qualify as disinterested judges is irrelevent. If there was a problem as to how to provide an impartial appellate tribunal for these cases the burden of its solution was Local's.

We have considered all the remaining points made on this appeal with respect to the matter of reinstatement of the expelled appellants and would not grant relief to said appellants on the basis of those points.

Appellant Di Pietrantonio is entitled to limited relief. Although the collective bargaining agreements which were made by National with employers contemplated that opportunities for employment under the contracts are to be given to all members of any subordinate affiliated organization, which would include Di Pietrantonio, we do not believe that it was intended by these contracts or by any provisions in National's or Local's constitutions or other laws that any member is to have an absolute right to such work opportunities through the offices of a subordinate organization of which he is not a member. We are, however, of opinion that Di Pietrantonio was entitled, by virtue of section 1 of National's '' Port and Shipping Rules '' for the Atlantic and Gulf coasts, to be registered with any

subordinate organization for work opportunities, on request. There appears to be no remedy within the framework of National and Local which Di Pietrantonio could have pursued.

Pecuniary damages may not be awarded to appellants against any of the respondents. This is so insofar as Local is concerned because it is an unincorporated membership association and there was no evidence that its membership as a whole was guilty of fraud or bad faith, or knew or approved of any irregularity in the proceedings within the organization (see *Glauber* v. *Patof,* 294 N. Y. 583; *Martin* v. *Curran,* 303 N. Y. 276). In an action for damages against such association and an individual thereof, the individual may be cast in damages separately and apart from any damages which may be awarded against the association, as a tort-feasor for his own individual wrong and regardless of derivative liability on his part as a member of the association (*April* v. *Baird,* 32 App. Div. 226; *Lubliner* v. *Reinlib,* 184 Misc. 472). In our opinion the evidence was not such as to permit an award of damages against the individual respondents. No tortious wrongdoing on the part of National has been proved.

Appellants have not offered any objection to the judgment insofar as it enjoins the use of AMA's name, upon respondents' counterclaim. This injunction was granted on the ground, as stated in Special Term's opinion, that the name " is misleading and lends itself to the misconception that it is a duly chartered local of the national organization or a branch of a duly chartered local " and that its use was therefore violative of a certain provision of National's constitution. This part of the judgment should not be disturbed.

The judgment should be modified on the law and the facts so as to direct that appellants other than Di Pietrantonio be restored to good standing as members of respondent New York Association No. 88 of Masters and Mates of the National Organization Masters, Mates and Pilots of America, Inc., and to all rights as such members, to direct that appellant Di Pietrantonio be registered for work assignments in the offices of said respondent, and to direct that appellants other than Di Pietrantonio be restored to all rights as members of respondent National Organization Masters, Mates and Pilots of America, Inc. As so modified, the judgment should be affirmed, with costs to appellants. The findings of fact, insofar as they may be inconsistent herewith should be reversed and new findings should be made as indicated herein.

NOLAN, P. J. (dissenting in part). I am of opinion that, as to appellants Polachek and Sohnen, there was sufficient proof,

in the absence of evidence of justification for their conduct, that they had engaged in activities which constituted a gross breach of their obligation of loyalty to their union, and that proof of such activities warranted their expulsion. (Cf. *Polin* v. *Kaplan,* 257 N. Y. 277, 282–283.)

HALLINAN and KLEINFELD, JJ., concur with WENZEL, J.; NOLAN, P. J., concurs insofar as the judgment is modified as to appellants Madden, Liddy, Friedman and Di Pietrantonio but dissents insofar as the judgment is modified as to appellants Polachek and Sohnen, and votes to affirm the judgment without modification as to such appellants, with memorandum, in which UGHETTA, J., concurs.

Judgment modified on the law and the facts so as to direct that appellants other than Di Pietrantonio be restored to good standing as members of respondent New York Association No. 88 of Masters and Mates of the National Organization Masters, Mates and Pilots of America, Inc., and to all rights as such members, to direct that appellant Di Pietrantonio be registered for work assignments in the offices of said respondent, and to direct that appellants other than Di Pietrantonio be restored to all rights as members of respondent National Organization Masters, Mates and Pilots of America, Inc. As so modified, judgment affirmed, with costs to appellants. Findings of fact, insofar as they may be inconsistent with the opinion herein, are reversed and new findings are made as indicated therein. Settle order on five days' notice.