Abraham N. (teller, J.
This case involves three categories of plaintiffs, several groups of defendants, and many different issues. It is concerned with the legal consequences of a secession or withdrawal of 8,500 members of New York Federation of Post Office Clerks, Local 10 (“ Local ”) chartered by the National Federation of Post Office Clerks (“National”), who followed the leadership of the entire body of officers of the Local into a new union formed by them on December 4,1958, but with 600 of the remaining members continuing their affiliation with Local 10. The basic thrust of the complaint is that the officers dominating Local 10 — the principal defendants herein — led it along the path to secession and as part of that plan and in preparation for the ultimate withdrawal, stripped Local 10 of its assets and used its auxiliary organizations, its Family Hospital Plan and Federal Credit Union, as magnets to draw the membership away from Local 10 and into the new union.
In considering and evaluating the complex of national and local relationships in this union, the background of events and the acts of the parties in the “ cold war ” which culminated in the secession of December 4,1958, it is important to keep in mind certain fundamental concepts in the field of labor law.
The right to criticize and to work for reforms within the framework of the union, whether on the national or local scale, is recognized as the civil right of union members, who are essentially “citizens” within an industrial “government” with rights and obligations analogous to those of a citizen in relation to his government (Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1074; Irwin v. Possehl, 143 Misc. *25 855, 858; see, also, “Union Democratic Processes”, Ethical Practices Code VI, AFL-CIO, and Kennedy-Ervin labor bill, passed by the Senate on April 25, 1959). This democratic principle has been set forth in clear and concise terms by the Court of Appeals, per Judge Fuld, in Madden v. Atkins (4 N Y 2d 283, 293): “ If there be any public policy touching the government of labor unions, and there can be no doubt that there is, it is that traditionally democratic means of improving their union may be freely availed of by members without fear of harm or penalty. And this necessarily includes the right to criticize current union leadership and, within the union, to oppose such leadership and its policies.” It was there held that the plaintiffs’ acts and program did not constitute “ dual unionism ” as charged, and they were, therefore, held entitled to recover damages for their wrongful expulsion by the union membership.
The right to work for reforms ‘1 within the union, ’ ’ it should be noted, does not include the right to undermine the union by advocating and facilitating the formation of a dual and rival union. The difficult question here is to fix the point at which the efforts of Local 10’s officers to gain approval by National’s officers of the program of the progressive movement (more fully covered below), or to compromise their differences, were abandoned and steps definitely planned and taken toward secession. The still more difficult question is to determine which of said defendants’ acts even during the negotiation stage were impregnated with designs of secession. To the extent that defendants’ acts are held to be embraced within the former category, no penalty may be invoked; to the extent, however, that they are deemed to be solely in contemplation and facilitation of the secessionist movement, these defendants are chargeable with the legal consequences of their acts.
It is undisputed that the officers of a union are fiduciaries of its funds and assets, which are held by them subject to the provisions of the constitution of the national union and the constitution and by-laws of their own local union. The basic principle underlying all the decisions in cases involving property rights arising from the withdrawal of a local union or part of its membership from the parent organization is that the constitution of the parent organization, the charter granted to the local, and its own constitution and by-laws constitute an integrated and mutual contract binding upon these organizations as well as upon the membership of the local. (Alexion v. Hollingsworth, 289 N. Y. 91; Steinmiller v. McKeon, 21 N. Y. S. 2d 621, affd. 261 App. Div. 899, affd. 288 N. Y. 508; Brownfield v. Simon, 94 Misc. 720, affd. *26 174 App. Div. 872, affd. 225 N. Y. 643; Seslar v. Union Local 901, 87 F. Supp. 447; Ann. 23 A. L. R. 2d 1209.)
The constitution of Local 10 has the usual provision found in almost all union constitutions: ‘ ‘ This Union shall not have the power to dissolve itself while there are ten (10) dissenting members in good standing ” (art. III). At the trial it was stipulated that Local 10 is a continuing organization having 10 or more members. In fact, the uncontested proof was that it now has 600 dues-paying members. National’s constitution has the usual forfeiture provision found in almost all union constitutions: “ all funds, assets and properties, real and personal, of the local shall remain in the local as long as it continues in existence. In the event of the complete dissolution of any local or its disaffiliation or secession by unanimous vote, all the funds, assets and properties, real and personal, of the local shall revert to the National Federation to be held in trust for the purpose of forming a new local ” (art. VIII, § 5). Since Local 10 has continued to exist, it — not National — is entitled to all the funds and assets which belonged to it and which are found to have been improperly diverted by these defendants.
These provisions appear to have been borrowed from charitable and fraternal associations, where they assured continuity of the benevolent purposes for which they were established. The courts saw no reason to hold that they were confiscatory or against public policy and enforced them in the same manner as any contract made by parties which does not transcend public policy or the law of the land. The penalty suffered by a majority, or even all, of the members of a subordinate association in withdrawing from it and thereby losing all their rights in its assets was not seen as a grave injustice, because the assets would still be devoted to the charitable or fraternal object for which they were contributed.
Nevertheless, in particular cases of hardship some courts found relevant special factors calling for flexibility in the application of this provision. (See Ann. 23 A. L. E. 2d 1209.)
This tendency has been more marked in the case of labor unions and even more so in recent years. It has been pointed out that, although in form and structure they are voluntary associations the same as charitable and fraternal associations, they have far greater powers and more diverse functions and responsibilities, and that courts must take cognizance of this tremendous difference when applying to unions principles of law generally applicable to such associations (Summers, Legal Limitations on Union Discipline, 64 Harv. L. Eev., supra, pp. 1050- *27 1051; Cox, The Role of Law in. Preserving Union Democracy, 72 Harv. L. R. 609, 613-619). Also, as previously noted, a union is in a broad sense an industrial ‘ ‘ government ’ ’ whose members are entitled to certain rights and privileges as “ citizens” thereof.
It has been said that the relationship between a union and its members is sui generis, that the union is a creature of consensual relationships, though not necessarily a legal entity for all purposes distinct from its component members (Harker v. McKissock, 7 N. J. 323). Perhaps, there will be finally evolved some concept as the result of legislation or changing circumstances which will recognize the essential differences between labor unions and fraternal associations and provide equitable rules appropriate to the sui generis nature of union relationships.
The problem of enforcing such forfeiture provisions when the vast majority, or all, of the members of a local union decide to exercise their democratic right to form a new union, has not been satisfactorily solved. The majority certainly should not be permitted to denude the union treasury in contemplation of disaffiliation, leaving nothing for a minority who wish the union to continue to exist. On the other hand, it seems inequitable that a great majority, even all, of the members should suffer the loss of their entire investment in the union if they find it necessary for exceedingly good reasons to disaffiliate. However, unless they can establish frustration of basic purpose or breach of a fundamental implied condition, such as domination of the union by racketeers or Communists or its expulsion by the AFL-CIO, there appears, in the absence of legislation, to be no relief from the binding effect of this contract available to them under, present decisional law.
In this case defendants do not claim that any such exception exists and concede the applicability of the rule that all the funds and assets shall remain with the dissenters continuing Local 10, but maintain that they made no unlawful transfers and turned over everything to Local 10 which belonged to it.
Such forfeiture provisions in union constitutions and by-laws have been held by the highest courts of this and other States to be legally enforcible in accordance with its terms. (See above group of citations headed by Alexion.) Trial courts are bound to follow their decisions.
Despite its harsh impact upon the great majority of Local 10’s membership who withdrew and joined the new union, this court must apply the rule fairly to the payments made by these defendants resulting in the dissipation of the Local’s funds. But there *28 is no just reason for extending beyond its natural scope this strict provision which operates so completely to the disadvantage of majority groups asserting their democratic and free choice of association. The court has taken into consideration both the rule and its reasonable limits in resolving each of the issues requiring its application.
Before turning to the facts of this ease, it should be observed that in this action for an injunction and other equitable relief the parties are entitled to any relief warranted by the facts proved at the trial; that technical pleading defects in the complaint should be disregarded, particularly in view of the fact that this suit was commenced on December 12, 1958 —almost immediately after the formation of the new union — and the parties thereupon proceeded to trial upon a preference without making any pleading motions; and that the trial evidence, though exploratory and discursive because of the failure to obtain examinations before trial and bills of particulars, did fully cover every possible issue in controversy with complete opportunity to each party to present his views. This opinion must necessarily include a fairly complete statement of the essential facts found by the court in view of the merger by both parties of valid and invalid portions in most of their proposed findings. Any findings not included or embraced herein are to be deemed refused.
National is a labor organization established in 1905 and having in 1958 approximately 105,000 members employed as post-office clerks and organized in 5,900 locals chartered by National, including Local 10 which had been chartered in 1907 with jurisdiction in Manhattan and The Bronx. National’s constitution recognizes the fact ‘ ‘ that legislation and not strike is the last resort in the adjustment of our grievances.” National is an affiliate of the AFL-CIO and both its constitution and that of Local 10 expressly state that they ‘ ‘ desire to be and to remain in full affiliation with that body ” as “ the most practical method of advancing the interests of all wage earners.”
About 12 years ago a group of the larger locals, including Local 10, formed a Progressive Fed. Committee (“Progressives ”) to work for democratic reforms in the national setup, better representation by National of individual grievances, and more vigorous handling by National of legislative matters affecting the membership. These larger locals were placed at a disadvantage by the outmoded formula in this old constitution for representation by delegate vote at national conventions, whereby Local 10, for example, with approximately 10,000 members had only 10 votes and could be outvoted by 11 small locals, each hav *29 ing only 3 members or a total of 33 members. A referendum held in May, 1958 resulted in the defeat of a proposed amendment to the opposite extreme — that delegates cast votes equal to their particular local’s membership. The Progressives also complained that the 16 National officers, each having one convention vote, and together constituting its executive board, could outvote the entire membership of Local 10 at conventions and allegedly voted to perpetuate themselves in office. After the defeat of the referendum, they concentrated their efforts on urging the national convention and officers to indorse and recommend the election of National officers by referendum ballots and of National vice-presidents by the membership of their respective districts. National’s repeated responses to these overtures were that the proposals constituted amendments to the constitution and until the rank and file voted in their favor, it would do nothing about them.
The Progressive Fed. Committee was financed by monthly contributions from several of the larger locals, including Local 10. The official publications printed by each of these locals for their members kept up a continual campaign publicizing such contributions as well as the program and actions of the committee. All of this was well known to National’s officers. Indeed, the secretary-treasurer of the committee was a National vice-president. There were conferences from time to time between the two groups for the purpose of ironing out their differences.
The first open break occurred at the national convention held in Boston in August, 1958, when the delegates of the locals supporting the Progressives walked out two hours before its conclusion. Thereafter, as we shall see, each of the protagonists took steps in preparation for the possibility of suspension by National or of secession by these locals, if, in the judgment of that party, matters should finally require such drastic action. This case is concerned with the actions taken at and after this convention leading to the suspension by National’s executive board of Local 10 and all its officers on December 1,1958 and the formation of the new union on December 4, 1958.
To gain perspective in broad outline of this schism, it may be noted at this point that National suspended on December 1,1958 nine of the larger locals and that on January 17, 1959 a National Postal Clerk’s Union, allegedly representing over 25,000 former members of National, was organized by the Progressives.
It is quite clear that a determination of the issues in this action and in the'similar actions instituted in the jurisdictions of the other locals affected will not dispose of the basic problems under *30 lying this interunion conflict. With the consent of all parties and without prejudice to the instant litigation, the court arranged for conferences between representatives of the two factions in the hope that some modus vivendi could be reached which might lead to the resolution of that problem. Although the attempt was unsuccessful, there may be some hope of further progress indicated in the fact that the parties were at least willing to sit down and talk together. It is obvious that in unity there is strength and equally obvious here that the new union and its new national parent seek affiliation with the AFL-CIO, a status already achieved by National. Such unity and affiliation would naturally be productive of more effective grievance and legislative activity — the principal purposes of unionization of these post-office clerks. There is no question here of racketeering or divisive Communist infiltration. All the members have common interests and aspirations which should serve to bring them together. The court strongly urges that irrespective of the results reached in the pending litigations, steps be promptly taken to resolve the basic differences between the two unions.
Addressing ourselves now to the direct operative facts of this case:
The AFL-CIO Executive Council adopted six Codes of Ethical Practices which were affirmed by its 1957 convention. All affiliates were required to comply with the provisions of these codes promptly “ with the only permissible delay being in cases where compliance required alteration of a union’s constitution by convention action. ’ ’ Code VI, ‘ ‘ Union Democratic Processes, ’ ’ provided, among other rights, for the right to fair treatment and due process in disciplinary proceedings — “ notice, hearing and judgment on the basis of evidence ’ ’; directed that the power to establish trusteeships of local unions be exercised “ only in accordance with the provisions of the union’s constitution”; and that whatever constitutional amendments were necessary to comply therewith be undertaken at the earliest practicable time.
The only provisons dealing with disciplinary action in National’s constitution consist of an automatic suspension for nonpayment of per capita tax and authority to revoke the charter of any local whenever, “ upon evidence satisfactory to a majority of the Executive Board,” it is shown to be guilty of disloyalty or of actions detrimental to the welfare of the rank and file. The subject local has the right of appeal to the national convention.
*31 It is obvious that without an implementing amendment the latter provision was not in compliance with the AFL-CIO mandate. Apparently concurring with this view, National President House testified that National’s executive board recommended that a Code of Disciplinary Proceedings be approved as a constitutional amendment by the constitutional committee at the Boston convention held in August, 1958. But that committee failed to report it to the floor because there was not ‘ ‘ time enough to get to it.” The convention did, however, adopt a motion authorizing the president and executive board to take all steps to protect the interests of National in the event any subordinate body threatened disaffiliation or secession.
Shortly after the close of the convention the Code of Disciplinary Proceedings was proposed to the executive board and adopted by it during the month of September, 1958. Among the listed offenses calling for disciplinary action was “ (d) engaging in dual unionism or in a secessionist movement ’ ’. Except in cases of automatic suspension for nonpayment of dues, no disciplinary action was to be taken until the accused was furnished with a copy of the charges and notice of hearing and given a full trial. However, ‘ ‘ in emergency situations where secession or dissolution of a subordinate body is threatened, or where the dissipation, removal or loss of the funds or assets of a subordinate body is threatened, the President is empowered summarily to suspend, with approval of the Executive Board, pending a hearing as aforesaid, which hearing shall be held within 30 days after said suspension. ’ ’ In such case the president was empowered to appoint a trustee to ¿ssume charge of the suspended subordinate body. Appeals could be taken (1)' to the executive board and (2) to the convention. AIT remedies provided in the code must first be exhausted before resorting to a court of law.
Shortly after the Boston convention the Progressives filed a written appeal to President Meany of the AFL-CIO and to its Ethical Practices Committee complaining of “undemocratic” and “ unethical ” practices in National’s setup. They also took steps to arm themselves and to prepare for “future action.” A conference of the Progressives on September 5, 1958, which was “ a follow-up on the walk-out” at the Boston convention, proclaimed their readiness to meet with the National officers concerning democratization of the constitution,, as well as the continued prosecution of the pending appeal to the AFL-CIO, *32 but with further action to be considered in the event National gave no indication of electoral reform and the appeal was denied. They proposed that support be given to any Progressive local against whom National moved to take over its charter or assets.
On September 11,1958 Local 10’s executive board, consisting of its 14 officers and approximately 240 delegates, indorsed the walk-out, adopted these recommendations, voted to engage special legal counsel “ to protect the interests of the membership of Local 10” and to contribute $300 to the St. Paul local, then directly involved with National, and $800 per month effective October 1 to the National Progressive-Fed. Committee. At the regular membership meeting, held September 17, all of these recommendations were adopted and a committee of five top officers appointed to carry them out and any other actions deemed necessary to protect the interests of the members.
At the Local’s executive board meeting of October 7, National’s new code was discussed. The president of the Local stated that the drastic remedy of suspension and trusteeship could be invoked if anyone spoke out in opposition to National, that “ we must be prepared to protect the funds of Local 10 and the Family Hospital Plan” and for that reason the board of officers was recommending that a retainer fee of $7,500 be paid to counsel. Payment to counsel of $5,000 on October 7 and $2,500 on October 15 was thereafter made. Payment also was made to the Progressive-Fed. Committee of $800 on October 3, and $2,400 on October 7.
The regular membership meeting of October 15 ratified by resolution the payment of the retainer fee of $7,500.
On October 18, Local 10’s board of officers made arrangements regarding the five-year lease in its name for the entire third floor occupied by it and its two subtenants — its auxiliary organizations, Local 10 — Family Hospital Plan and Local 10 — Federal Credit Union. The officers returned the lease to the landlord, who immediately entered into a new lease with the Credit Union (which was a corporation chartered under the Federal Credit Union Act with 5,400 of Local 10’s membership as its members) which then sublet to Local 10 and to the Family Hospital Plan the space they formerly occupied. This arrangement was evidently intended to protect against National’s attempting to take over the premises.
October 29,1958 was the date of the annual membership meeting of the Family Hospital Plan. This Plan was an unincorporated association formed by Local 10, whose members only, *33 according to the Plan’s constitution, were eligible “to become and remain ’’members of the Plan by paying premiums therefor. The Plan had about 4,600 members. The board of directors of the Plan had appointed a committee on October 2 to study and report on “constitutional changes.” The proposed changes received the “ approval ” of counsel. Notice of the annual meeting was given in the usual manner. The notice set forth among the proposed amendments to the Plan’s constitution the subject of “ clarification of membership eligibility.” The amendment was adopted in accordance with the Plan’s constitutional provision for amendments. Membership in this association, whose name was thereby changed to ‘ ‘ The Family Hospital Plan of the New York Post Office Clerks,” was now to be available only to members “ of a union of New York Post Office Clerks designated by the Board of Directors.” This amendment evidently wás intended to thwart any possible move on National’s part to take over the Plan and at the same time prepare for the possible withdrawal of the members of the Plan from Local 10, in which event they would still be eligible as Plan members if the board of directors then made the appropriate designation.
In November the AFL-CIO rejected the Progressives’ appeal on the ground that it would not intervene in the internal affairs of the union. A second appeal was submitted but no reply received. At the November 19 meeting of Local 10 there was a discussion regarding secession. A speaker from another local referred to the “ time for action” as being in Philadelphia at the Progressives’ conference set for November 22. Local 10’s president assured the members that no action to secede had yet been taken and that whatever action was adopted at Philadelphia would be submitted to referendum vote of the Local 10 membership.
On November 20 representatives of the Progressive-Fed. Committee met by appointment AAdth several officers of National in Washington, D. C. in an attempt to arrive at some solution or compromise, but without success.
Several National officers were present at the Progressives’ conference in Philadelphia and National President House addressed the meeting by invitation. But the breach could not be healed. The conference adopted a resolution which recited the complaints of the Progressives and their futile attempts to get some relief from the National or the AFL-CIO and approved a policy of disaffiliation to take effect on February 15, 1959 (the anticipated final date for decision on the second appeal to the *34 AFL-CIO). However, the resolution went on to direct that locals affiliated with the Progressives ‘ ‘ shall immediately upon adjournment of this Conference initiate action in their own locals tending to ultimate disaffiliation” and that the steering committee try to secure affiliation with other postal unions or with other AFL-CIO unions.
After adjournment of the conference, Local 10’s officers ordered new membership application cards with a blank space for the imprint of the name of the new union. Dues collected by the delegates and received by the Local beginning with November 26 were not deposited in the Local 10 account, but returned in large part on December 4 to the delegates, with only a portion thereof being deposited on December 4 to help cover checks drawn on December 2.
On December 1 National’s president and executive board determined that an emergency of “imminent” secession and dissipation of assets existed (evidently, although not stated, because of the Philadelphia resolution) and, acting “pursuant to the Code of Disciplinary Proceedings, ’ ’ suspended Local 10, placed it under trusteeship and suspended all its officers. A directive was issued stating that a hearing would be held within 30 days and that a further notice would be sent. No specification of charges was included. Charges were not filed until December 8. The hearing was then fixed for December 29, but none of the defendants attended.
Local 10’s officers did not receive official notice of the suspension until December 3, but they learned about it on December 2 from the press. On that day the board of officers met in an 8-hour session — discussing the suspension, drawing 250 checks (constituting, if they had all cleared, an overdrawal of the funds in the account) and making plans for the formation of a new union at the December 4 meeting of the executive board. They had the printer imprint the proposed name of the new union on the new membership cards. On December 3 they informed the trustee appointed by National that they would not turn anything over to him without a court order. On December 4, at the meeting attended principally by officers and delegates, a new union was established by a preponderant vote in favor of the motion submitted by the entire body of officers acting as an organizing committee. The new membership application cards were then distributed to the delegates for the purpose of soliciting members. The dues previously forwarded by delegates, the receipts fop which had been voided, were returned to them,
*35 Later that evening the hoard of directors of the Family 'Hospital Plan met and designated the new union as the union whose members would be eligible as members of the Plan. By this action all Local 10 members were excluded, even those who were members of the Plan.
On December 8 the board of directors of the Federal Credit Union voted a proposed amendment to its by-laws which eliminated a provision therein that a member leaving the field of membership (Local 10) was required to terminate his membership, effective by February 1 of the following year, and thereupon limited the field of membership to members of the Credit Union as of December 5, 1958. This amendment was approved, as required by law, by the director of the Bureau of Federal Credit Unions. This freezing amendment protects — for the time being — all credit union members, whether members of the new union or of Local 10.
In the meantime the trustee was able to freeze the Local’s bank account, thus stopping many of the checks. Defendant officers had, however, arranged to certify a substantial number, most of these being for salary, honoraria and expenses to themselves.
This action was instituted on December 12, 1958. On December 19, a few days after the service of the order to show cause on the motion for a temporary injunction, books, records and some physical assets were turned over without prejudice to the trustee, but possession of the portion of the third floor occupied by Local 10 was refused by defendant officers. The order on said motion, entered January 22, 1959, enjoined defendants from interfering with plaintiffs’ use of the premises occupied by Local 10 in December, 1958, directed -that members of Local 10 as of December 4, 1958 be deemed eligible to become and remain members of the Family Hospital Plan, and granted the parties an immediate trial. On February 1, 1959 the third floor was vacated and the trustee and Local 10 moved in, taking over the former lease by arrangement with the landlord. The Credit Union had entered into a lease for the fourth floor of the same building and on that day the Credit Union, the new union bearing the name of Postal Union of Manhattan-Bronx Clerks, and the Family Hospital Plan moved upstairs.
During the course of the trial various items of physical assets claimed by plaintiffs as the property of -Local 10 were returned. At the conclusion of the trial plaintiffs made no request for relief in that respect.
*36 The following relief is requested by the plaintiffs — National President House, the trustee, and several members of Local 10 suing in behalf of themselves and all other members of Local 10 similarly situated:
L The individual defendants, former officers of Local 10 and fiduciaries of its assets, conspired to, and did, denude the treasury of Local 10 and should be directed to return the moneys improperly disbursed and, in addition, should be held liable for the damages sustained as the result of their conspiracy.
a. $300 paid to the St. Paul local.
b. $3,200 paid to the National Progressive-Fed. Committee.
c. $2,500 paid to defendant Otto Gottlieb without membership approval on December 2, 1958, allegedly for past legal services. (Gottlieb is in the first instance accountable therefor and if he should return said sum, these defendants are to be credited therewith.)
d. $3,098.45 in dues returned to delegates after the voiding of receipts therefor.
e. The total of the payments made on December 2, 1958 to these defendants themselves computed at $4,647.16 in plaintiff’s main brief and at $6,432.13 in their reply brief.
f. Damages sustained by Local 10 for the loss of dues from members who were “ lured by the conspirators ” into the new union, the loss fox; the three months of December 1958, January and Febraary 1959 (prior to the trial) being computed at $49,350.
(Plaintiffs also include the per capita tax which was due from Local 10 to National and unpaid for the months of October and November 1958. But this does not represent an additional item to be collected from defendants. It was included in the funds of Local 10 and is part of the dues turned in by its delegates, which were allegedly dissipated by defendants, and thus embraced in the other items claimed.)
Plaintiffs also claim:
g. $684, representing the cost of the removal, storage and return of the physical assets turned over on December 19, 1958 and stored until possession of the premises was obtained on February 1, 1959.
(As against these sums, these defendants may be entitled to an offset for certain obligations of Local 10 paid by the new union. Although the new union has not been sued and is not a party, it is reasonable to assume that it will consent to defendants’ taking the benefit of such offset and will execute an assignment thei'eof to defendants. The amount claimed is $3,100.)
II.Defendant David Ashe should be ordered to return the $7,500 legal retainer received by him.
III. Defendant Otto Gottlieb should be ordered to return the $2,500 legal fee fee received by him.
IV. As to the Family Hospital Plan: to declare null and void all acts and amendments which would make it available to persons other than members of Local 10, to declare that all the funds and assets of the Plan shall be devoted to the benefit of members of Local 10 only, and “to raise up” new administrators of the Plan consisting of members of Local 10 only.
*37 V. As to the Federal Credit Union:
a. To declare null and void all amendments whereby its field of membership was frozen and to direct it to restore the field to members of Local 10 only.
b. Requiring it to pay to plaintiffs the damages they sustained “by virtue of its unlawful acts in furtherance of the unlawful conspiracy.”
YI. Plaintiffs also request a declaration that Local 10’s telephone number, appropriated by the new union and later shared by a special monitoring service, is its exclusive property; and that the individual defendants be restrained from carrying on “ their unfair competition ” from any portion of the building in which both unions are now operating.
We must pause, first, to consider defendants’ attack on the legal capacity to maintain this action of each of the three categories of plaintiffs.
The individual plaintiffs — members of Local 10 suing on behalf of themselves and all other members of Local 10 — have undoubted capacity to sue in this representative action. (Civ. Prac. Act, § 195; Steinmiller v. McKeon, supra; Seslar v. Union Local 901, supra; Hogan v. Williams, 185 Misc. 338, affd. 270 App. Div. 789; Schimmel v. Messing, 117 N. Y. S. 2d 423, affd. 282 App. Div. 777, affd. 306 N. Y. 841; Tortorella v. Davis, N. Y. L. J., Jan. 7, 1949, p. 80, col. 5.) Although the statute (G-eneral Associations Law, § 12) permits suit to be brought by the president or treasurer of an unincorporated association, that is merely an alternative to the common-law rule that the action be brought in the name of all the members. The statutory alternative was rendered unavailable by the withdrawal and implicit resignation of Local 10’s entire body of officers. Moreover, their actions disabled Local 10 from operating as a normal functioning organization and they may not be heard to complain of the alleged incapacity to maintain this representative action by any remaining member of Local 10 suing pursuant to section 195 of the Civil Practice Act. Cavanagh v. Hutcheson (140 Misc. 178, affd. 236 App. Div. 794) is not to the contrary. A representative suit was there said to be available only as to a limited fund and not in an action for general tort damages. Assuming the validity of the distinction, the relief sought in this action does qualify under the formula.
It should be observed that three of the five individual plaintiffs who instituted this action subsequently executed documents of withdrawal from sponsorship of the action. However, two other remaining members of Local 10 testified at the trial on its behalf, and 14 other members of Local 10 executed affidavits in support of the motion for temporary injunction, stating that *38 they desired Local 10 to continué in existence. The evidence showed that there are about 600 members in Local 10. The parties stipulated that Local 10 is a continuing organization having 10 or more members. In view of that stipulation and the express provision in the constitutions of National and Local 10, all funds, assets and property rights of the Local remain in the ownership of Local 10 as now constituted. Defendants concede this (maintaining, however, that they did not improperly expend or take any funds, assets or properties belonging to Local 10). One or more of the present members of Local 10 may maintain this action on its behalf.
The individual plaintiffs also have capacity to sue for the relief requested with regard to the Family Hospital Plan and the Credit Union. They assert not only the rights of those members of Local 10 who happen to be members of the Plan or of the Credit Union (one of the remaining plaintiffs and many of the 600 present members of Local 10 were members of the Plan and the Credit Union on December 4, 1958), but also the right claimed by Local 10 that these organizations be devoted to the interests of members of Local 10 only.
Since there are individual plaintiffs capable of maintaining this action and obtaining all the relief requested on behalf of Local 10, a continuing organization, the interposition of the National president suing on National’s behalf is unnecessary and under the circumstances, without legal foundation. Had there been no subsisting plaintiff or none available at the time, certainly relief to the extent of restraining the transfer or disposition of Local 10’s assets would have been open to him; and if the disaffiliation had been unanimous, National could have sued for all relief under the forfeiture provision of the National constitution. But National could not by edict or fiat divest the title of Local 10 without its consent or due process of law, and take it over (Wicks v. Monihan, 130 N. Y. 232; Austin v. Searing, 16 N. Y. 112). No “inherent power” in National to protect the property rights of Local 10 can be spelled out of the constitutional provision authorizing the revocation of a local’s charter for disloyalty. Here there was no charter revocation and Local 10 continued in existence with express power under National’s own constitution to hold and recover its property. This provision renders the ‘ ‘ inherent power ’ ’ concept wholly' inapplicable. Fitzgerald v. Abramson (89 F. Supp. 504) is clearly distinguishable: that was an application for a preliminary injunction which was granted only to the extent of restraining the transfer of certain bonds; the court *39 found that the National union had a direct property interest in the local arising from the large amounts spent by it in organizing the local; and the locals in that particular union setup were found to be mere convenient administrative subdivisions of the parent organization.
The appointment of the trustee by the National president pursuant to the Code of Disciplinary Proceedings must be held to be invalid. He, therefore, has no title, authority or standing to sue.
National’s own official explanation of the code states that it “is mandatorily required in respect to any affiliates of the AFL-CIO Ethical Practices Code VI.,” That mandate, however, expressly limited the exercise of the power to establish trusteeships “ only in accordance with the provisions of the union’s constitution,” and where amendment was necessary to comply therewith, to so amend “ at the earliest practicable time.”
The excuse offered for not submitting the Code of Disciplinary Proceedings to the National convention for approval as a constitutional amendment is unacceptable. The court will not countenance different standards of conduct for these two antagonistic factions. The adoption of that code by the officers and executive board of National, which includes the power of appointment of trustees of locals, without it having been duly enacted by amendment of the National constitution, constitutes an arrogation of power which cannot receive judicial sanction. The power of National to replace the leadership of locals by such trustees is a potentially dangerous weapon which could easily be used not only to perpetuate National’s officers in power, but also to dominate the affairs of locals deemed troublesome by National, and by the mere threat of its use, to squelch any opposition to National’s leadership. Approval of such peremptory and illegal method of adoption of a Code of Disciplinary Proceedings would create a bad precedent which could readily be abused and which is detrimental to good labor union practices.
There are, of course, in some cases, reasonable, and on rare occasions even indispensable, grounds for the appointment of trustees. But the danger of misuse of this drastic disciplinary remedy is so grave that all authorities are in agreement that provision therefor must be found in the constitution and by-laws of the union, that such provisions must conform to due process, and that constitutional procedures must be strictly followed (Cox, The Role of Law in Preserving Union Democracy, 72 *40 Harv. L. Rev., supra, pp. 635-644; Canfield v. Moreschi, 268 App. Div. 64, affd. 294 N. Y. 632; Schrank v. Brown, 192 Misc. 603; see, also, Kennedy-Ervin labor bill passed by Senate, 1959, prescribing minimum standards for trusteeships).
Counsel for the plaintiffs has referred the court to decisions in cases involving the other seceding locals. It appears that in each case the court sustained the right of National’s President and the appointed trustee to maintain the action together with the individual remaining members of the locals. However, the point as to the invalidity of the code and the appointment of the trustee pursuant thereto does not seem to have been raised. These decisions, in any event, are of a preliminary nature and generally uphold the right to a temporary injunction. In one, where an opinion was written, the court appears to have assumed that the Code of Disciplinary Proceedings was a part of National’s constitution and by-laws. There is nothing in these decisions to change my conclusion as to the invalidity of this trusteeship. That conclusion was reached only after full trial presentation of all the facts, study of relevant authorities and consideration of the basic issues involved in Local-National relationships.
Finally, it may be noted that although the code directed that ‘‘the trustee shall be adequately bonded, ’ ’ no bond was posted for this trustee. Instead, reliance has been placed on the general employees’ bond of National. Coverage of trustees thereunder is a matter of involved construction. It would appear that the code contemplated a specific bond covering any trustee appointed thereunder.
The court makes the following disposition of the issues:
The two remaining individual plaintiffs suing on behalf of themselves and all other members of Local 10 are entitled to the following relief, granted in this equity action on the basis of conditions at the time of trial (Dickinson v. Springer, 246 N. Y. 203):
I. Judgment directing the individual defendants, former officers of Local 10, to pay the sums hereinafter indicated constituting unlawful transfers of the Local’s funds.
Realizing that upon secession all funds would either remain the property of 10 or more dissenters continuing Local 10 or revert to National, if there were no dissenters, the body of officers planned to transfer and dispose of these funds by the time secession became in their judgment advisable. Their position may be understandable in the light of the fact that the vast *41 majority of the Local fully supported the program of the Progressives. However, as fiduciaries, they are accountable for any transfer not made for a legitimate Local 10 purpose, which obviously embraces any dissipation of funds in contemplation and furtherance of secession (Steinmiller v. McKeon, supra; Seslar v. Union Local 901, supra). In addition to denuding the Local’s treasury, thus depriving any minority of its fair share of the funds, such dissipation naturally made it impossible for Local 10 to pay to National the October and November per capita tax collected from its members.
The facts of this case, however, compel the drawing of a distinction, which is logical, just and consistent with fundamental concepts in labor law and the actions of the parties. Since, up to November 22,1958, defendants had merely armed for but not initiated any overt steps leading to secession while the Progressives were still appealing to the AFL-CIO and conferring with National’s officers to obtain approval or compromise of their reform program ‘ ‘ within the union, ’ ’ the only payments made during this period which may be condemned as unlawful transfers, are those which are clearly tainted with design to dissipate in the interests of secession. The precise line of demarcation is not reducible to mathematical certainty. The court has striven to be both fair and realistic in making the allocations. After November 22, 1958 defendants were no longer really working within the union but rather, in accordance with the directive of the Progressives, in the interests of the secession movement. Accordingly, they are not entitled to payment from Local 10 for services rendered after said date. It will be noted that the establishment of this cut-off date — November 22,1958 — accords with National’s own interpretation of the Philadelphia resolution as the first actual step toward secession.
a. The $300 paid to the St. Paul local — The membership meeting of September 17 which voted for this contribution defeated a proposed amendment that “ this in no way ties us to the action of the St. Paul local to disaffiliate.” The intent that the contribution be in aid of that local’s disaffiliation attempt is clear.
b. $2,400 of the $3,200 paid to the Progressives — The motion adopted by the Local’s executive board and membership was to contribute $800 per month effective October 1 and that was paid October 3. This may be deemed in line with previous payments to the Progressives, which averaged somewhat below $200 per month. Occasionally the payments were larger — in February, 1958, $500 to aid in organizational trips and in August, *42 1958, $342. These contributions were fully publicized and known to all the members of Local 10 and to National. No contribution had been made in September, 1958, and the October 3, 1958 payment is allowable as covering the normal contributions for September, October and November, 1958. But the acceleration of future payments in the form of the $2,400 payment made on October 7,1958 was not authorized by the members and evidences a desire of the officers to transfer the Local’s funds as a preliminary step to the contemplated secession.
c. $2,000 of the $2,500 paid to Otto Gottlieb for alleged past services — The court finds (see III, infra) that the fair and reasonable value of the services rendered by him for Local 10 is not in excess of $500 and that he is not entitled to payment from Local 10’s funds for any services rendered in aid of the secessionist movement. These defendants paid the $2,500 without approval of the executive board or membership. They are accountable for $2,000 thereof. The judgment will provide that if Gottlieb makes payment, defendants’ liability is to be reduced thereby.
d. $3,698.45, representing the net amount of dues received from November 26, 1958 to December 2, 1958 and returned to delegates on December 4, 1958 — These defendants, in effect, were guilty of conversion in returning dues. “Dues and assessments paid by members to an association become the property of the association and any severable or individual interest therein ceases upon such payment.” (De Mille v. American Fed. of Radio Artists, 31 Cal. 2d 139, 149.)
e. Plaintiffs are entitled to the return of that portion of the payments made on December 2, 1958 by these defendants to themselves and to employees of “ N. Y. Fed,” the Local’s official publication, which represents payment of salary, substitution pay and honoraria for the period after November 22, 1958, together with the allocable portion of the social security payments and withholding tax thereon, with which defendants will be credited by the Government. In addition, the $50 payment for the officers’ supper on December 2, is to be returned. Except as to the period subsequent to November 22, 1958, the court does not adopt the “ faithless servant ” rule urged by plaintiffs in support of their claim that all payments made by defendants to themselves on December 2 shall be forfeited.
Counsel are to serve and submit within five days a stipulation as to said amount or memoranda containing itemized computations thereof.
*43 f. Plaintiffs are not entitled to damages for the loss of dues— Plaintiffs’ counsel concedes that members of Local 10, including its body of officers, had an absolute right to disaffiliate and to form or join a new union. His argument is that the officers conspired to lure the membership into the new union formed by them and are therefore liable for the damages sustained by Local 10 as the result of said conspiracy. Except for the aforementioned misapplication of union funds (which is not causally related to the alleged luring, but rather a by-product of the conflict), defendants committed no actionable tort. Damages for conspiring are recoverable only if “in furtherance of the conspiracy” some actionable tort is committed (Beardsley v. Kilmer, 236 N. Y. 80; Posner v. Greenspan, 261 App. Div. 979).
Defendants did propagandize for the program of the Progressives, did publicize through the “ N. Y. Fed.” the Progressives’ version of the conflict, and did by various maneuvers “ safeguard,” as they put it, the membership from any attempt by National to summarily take over the assets of the Local and its auxiliary organizations as well as to prepare for the possibility of secession. “ Safeguarding ” may, as plaintiffs charge, have been a euphemism for misappropriation, but that appears to have been-with the tacit approval of the great majority. It is unfortunate that the defendants did not submit the question of disaffiliation to a referendum vote, as promised. They urge that this slow procedure was rendered impractical by National’s suspension order. In any event, in the absence of a referendum, it is significant that each of the 14 elected officers, almost all of the delegates (who were nominated and elected each year by the members of their respective post-office stations) and about 8,500 of the members of Local 10 joined the new union. It may be that some were induced to join through fear of loss of Hospital Plan and Credit Union membership engendered by defendants ’ propaganda and by the afore-mentioned amendments by these organizations in “ safeguarding ” their members from National. It is possible that, if loss of Hospital Plan and Credit Union membership were not in question, some would have chosen to remain with Local 10 because of its affiliation with the AFL-CIO. But in view of the long history of this Local’s active participation in the Progressives’ program, openly and fully publicized in its official newspaper and indorsed in all respects for years by its membership, it is concluded that the great majority chose to join the new union of their own free will. Plaintiffs have failed to prove that any members at all *44 were induced to join because of any wrongful act on the part of these defendants. To recover damages, plaintiffs must show that they were damaged by defendants’ conduct and that the damages flow naturally and directly from defendants’ breach (25 Fifth Ave. Management Co. v. Ivor B. Clark, Inc., 280 App. Div. 205, affd. 304 N. Y. 808; Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205; Witherbee v. Meyer, 155 N. Y. 446). Moreover, it would be pure conjecture to attempt to fix any amount on these facts.
g. Plaintiffs are entitled to recover $6.84, representing the cost of removal, storage and return of Local 10’s physical assets, which expense was incurred because defendants refused to yield up the Local’s premises until after the granting of such relief in the temporary injunction order.
(As against the afore-mentioned sums, defendants are entitled to an offset — assuming that the new union will assign such claim to them — for the amount of the obligations of Local 10 paid by the new union. Counsel are to serve and submit within five days after filing of this decision a stipulation as to said amount or a concession of the relevant facts with sufficient itemization to permit the court to make the necessary computation.)
II. Directing defendant David Ashe to return $6,500 of the $7,500 retainer received by him:
To the extent that this fee was intended to compensate him for services to be rendered in “ devising the secession” from National and the “ organization of a new union,” it was for an “ unlawful ” purpose (Steinmiller v. McKeon, supra).
Defendants claimed that Ashe was retained solely to give advice to protect Local 10 from any aggressive actions of National and to defend its members if National brought on disciplinary or legal proceedings. The testimony indicated that the amount of the fee was contingent upon such eventuality. However, when the contemplated situation arose — the December 1 suspension — defendants, after conferring with Ashe, formed the new union instead of fighting the suspension.
It appears that he did render some services in studying the Code of Disciplinary Proceedings and the constitutions of the unions and advising defendants as to the rights of Local 10, its officers and members under those documents and applicable union law. He also attended at various meetings and conferences where, it is claimed, he advised against hasty secession. The reasonable value of those services rendered for Local 10 does not exceed, on a generous estimate, the sum of $1,000,
*45 If any other services were rendered in advising defendants with relation to the steps to be undertaken in disaffiliating, they are not compensable out of the funds of Local 10. It should be mentioned that there was no direct proof of such advice and assistance prior to December 2, 1958, but same may be inferred. (It is not, of course, claimed on behalf of Ashe, nor can it be held, that he may include as services rendered for this $7,500 any services after December 2 or in representing defendant officers in this action.) However, the court will not on the basis of the special facts herein shown forfeit this attorney’s right to all compensation on the ground of representation of interests adverse to Local 10. The services may be viewed as rendered for defensive as well as offensive purposes while the Progressives were continuing their efforts ‘£ within the union, ’ ’ and compensation may thus properly be allowed for the former.
III. Directing defendant Otto Gottlieb to return $2,000 of the $2,500 legal fee received by him.
This payment was made on December 2, 1958. The matter was never presented to any meeting of Local 10 for approval. It was claimed that G-ottlieb had rendered services from April, 1957 to December, 1958 in the form of conferences and telephone conversations with Local 10’s officers relating to such grievance matters as the type of questions on questionnaires to be filled out by probationers and alleged misuse of sick leave by members. He did not appear at any hearing or in court. No documentation of any kind was offered at the trial. No specific cases or matters were named. On the record presented the reasonable value of such services, compensable by Local 10, is not in excess of $500.
IV. As to the Family Hospital Plan, plaintiffs are entitled to equitable relief whereby members of Local 10 shall be deemed eligible to become and remain members of the Plan with the assurance of treatment equal to that accorded members of any union designated by its board of directors.
Plaintiffs’ demand with regard to the Hospital Plan — that Local 10 and its members have the right to prevent its diversion to purposes other than those for which it ££ created, nurtured and fostered ’ ’ the Plan — goes far beyond the facts embracing its relationship with Local 10 and the rationale of all the relevant cases. It also would violate the basic right of freedom of choice which must be granted to the majority so long as they proceed in accordance with due process and without infringing upon the vested rights of others.
*46 At the outset it should be noted that the Family Hospital Plan (and the Credit Union) is a separate organization distinct from Local 10 and in the legal sense not such an asset of Local 10 as would automatically remain with Local 10 upon the disaffiliation of the majority thereof or revert to National under the forfeiture provision of National’s constitution.
Asserting that an organization has the right to prevent an ancillary organization, created and supported by it, from being diverted from its “ organic purpose ” to be and remain available as a service to members of the parent organization only, as originally provided in the articles of association of the ancillary organization, plaintiffs cite Herman v. Brooklyn Sav. Bank (196 App. Div. 269); Liggett v. Koivunen (227 Minn. 114); Harker v. McKissock (12 N. J. 310); Hill v. Rauhan Arre (200 Mass. 438) and other cases.
But, in all of these cases, the court found a direct property interest in the ancillary organization by the parent and the relief granted was measured by the extent of that interest. In Herman {supra, p. 272) the right to equitable relief “to the extent of preventing the defendant from diverting or using the funds for purposes other than those for which they were given or contributed ” was expressly based on the $10,000 contribution made by the parent organization. In Liggett, the ancillary sick relief and burial benefit organization was not a separate association but a mere department of the local; its funds consisted of a portion of the regular dues paid by union members, all of whom were automatically entitled to benefits; and the court held that upon disaffiliation of the majority of the members from the union, the disposition of its funds was governed by the general rule that all union funds under the constitutional provision belonged to the remaining membership. In Harker, the ancillary society had title to certain real estate which had been purchased with money donated by the local. Hill also involved the attempted transfer of real estate bought with funds of the parent association, title being taken in the name of an ancillary organization.
In Herman, the court pointed out that the mere fact that the parent organization is instrumental in creating the ancillary .organization does not give the former the right to control the action of the latter. The only basis for controlling action on the part of the ancillary organization in attempted diversion from its organic purpose is through the finding of some direct interest therein by the parent organization which equity will regard as sufficient for the purposes of molding appropriate relief.
*47 The maximal nature of the relief sought hy plaintiff could only be granted upon a showing, as in Liggett, that the funds of the Family Hospital Plan actually derive from and belong to Local 10. That is not the case here.
The Family Hospital Plan was formed as a separate and distinct unincorporated association at a special meeting of the members of Local 10 in 1946. Its constitution and by-laws were then adopted and its first hoard of directors elected. The constitution provided that only members of Local 10 ‘ ‘ shall he eligible to become and remain members of this Plan.” The purpose of the Plan was stated to he “ to promote mutual helpfulness hy financially assisting members, spouse or unmarried children who may he enrolled as beneficiaries under this Plan.” Membership in the Plan was effective only upon payment of premiums. Less than one half of the Local 10 membership were enrolled as members of the Plan in 1958. The funds of the Plan, amounting to over $100,000 in 1958, consisted entirely of premiums paid hy its members.
Plaintiffs argue that the following benefits, services and assistance given hy Local 10 to the Plan constitute a sufficient interest to prevent a diversion of the Plan and its funds from its original purpose as a service available only to members of Local 10; advertising and exploitation services in constantly urging its membership to join the Plan; direct solicitation services through its delegates without charge; collection services through its delegates who collected premiums for a 2% commission, rather than the 6% payable for collection of dues; discussion and planning of measures for the improvement of the Plan at numerous meetings of the Local; regular advancement of certain disbursements on behalf of the Plan, which were later repaid. Plaintiffs also rely upon the following intimate relationship and ties between the Local and the Plan: ‘ ‘ Local 10 ’ ’ was part of the name of the Plan; the president and the treasurer of the Local were ex-officio officers and members of the board of directors of the Plan; the amendment hy the Local of its by-laws to permit retired members to retain membership in the Plan upon payment of dues in addition to premiums was followed hy a like amendment in the Plan’s by-laws; members in arrears in union dues could not receive benefits under the Plan; the Local paid for a service providing medical specialists at reduced fees which was integrated with the benefit provisions of the Plan; the Local’s membership card contained material referring to the Plan; the Local’s solicitation posters featured Family Hospital coverage as a benefit of membership in the *48 unión; and the Local and the Plan shared officers and the latter made use of the Local’s phone number and records.
It is clear under the very authorities cited by plaintiffs that these considerations do not constitute such a property right as to warrant granting the relief asked. They do, however, as hereinafter indicated, entitled plaintiffs to some measure of relief.
Plaintiffs ’ 4 4 organic purpose ’ ’ theory seems to stem from the law of religious and charitable associations. Imported into the field of labor law, it must be applied with discretion. (The general nature of this subject has been more fully covered in the earlier portion of this decision.)
The organic purpose of the Family Hospital Plan is to promote mutual helpfulness by financially assisting its enrolled beneficiaries. There has been no diversion from this organic purpose, though there may have been a deprivation of certain vested rights.
The October 29,1958 amendment of the Plan, changing membership eligibility from Local 10 to a union to be designated by the board of directors, was adopted in accordance with constitutional requirements and acceptable presumably to the great majority of its members, who joined the new union. It is therefore valid. But the board of directors may not implement the amendment by a designation which excludes Local 10 members. The field of membership may be broadened to include members of other unions but without impairment of vested rights. Leatherman v. Wolf (240 Pa. 557) involving a charitable association, furnishes a simple illustration. An amendment to the by-laws authorizing collections for a different charity than the one originally specified was held to be valid as to future operations; but moneys collected before the amendment were held to be impressed with a trust for the benefit of the original charity.
Obviously, the Plan may not deprive of membership therein present members of Local 10 who were members of the Plan on December 4, 1958. The Plan’s counsel suggested that they would continue to receive benefits as a matter of policy. This is not enough. Such members clearly have a vested right to membership. Their paid premiums are part of the funds of the Plan. The unqualified designation by the board of directors of the new union was as to them confiscatory and unlawful.
Then come those members of Local 10 as of December 4, 1958 who had not as yet enrolled in the Plan. Enrollment in the Plan was permitted only at stated times determined by its board of *49 directors. Members of Local 10 had the privilege by contract and usage to enroll at any such stated time as they found desirable or convenient. These members have a vested right to the continuing availability to them of membership in the Plan — a right which was part of the ‘ ‘ package ’ ’ of union membership and auxiliary benefits promised to them by Local 10 and its adjuncts when they signed up.
Though precedent is lacking for similar relief to future members of Local 10, the court is of the opinion that the equities of this case fairly compel such a determination. Equity will mold its relief to the necessities of the situation {Fitzgerald v. Abramson, 89 F. Supp. 504, supra).
Local 10, as an entity distinct from its component members, made use of the Plan to solicit and obtain members. At the same time it provided assistance, services and other benefits to the Plan, described above. The Plan accepted these benefits and was nurtured by them. It is accordingly chargeable with a correlative obligation to Local 10, and one which this court may enforce. "Where “ circumstances have arisen which make it just that one should have a right, and the other should be subject to a liability” {People ex rel. Dusenbury v. Speir, 77 N. Y. 144, 150) courts have found means to afford appropriate relief. Thus, courts have historically prevented unjust enrichment by employing a legal fiction: common-law courts used the term ‘ ‘ quasi contract, ’ ’ and courts of equity, ‘ ‘ constructive trust ” {Miller v. Schloss, 218 N. Y. 400). The two are essentially the same, as indicated by the court in Fayette Tobacco Warehouse Co. v. Lexington Tobacco Board of Trade (299 S. W. 2d 640 [Ky.], cert, denied 355 U. S. 824), in decreeing specific performance of a contract implied in law or quasi-contract.
In view of the benefits received by the Plan from Local 10, the past relationship between the two organizations and the practical considerations involved in this controversy, the court concludes that the Plan owes Local 10 the obligation to admit to membership all members of Local 10 who choose to enroll in it and who qualify. This obligation to Local 10 does not prevent the Plan from otherwise extending its field of membership by proper amendment.
Local 10 should continue to have the right to offer prospective members the inducement of Family Hospital Plan coverage. Moreover, any former members of Local 10 to whom Hospital Plan coverage is important and who may have joined the new union because the new union was designated as the Plan’s only eligible union, should be given a fair opportunity, previously *50 denied them, to select which of the two unions they honestly wish to join, Family Hospital Plan coverage being on an equal basis. If the Plan is required to be made available to future Local 10 members, such former members would be covered if they rejoined Local 10.
Unless equality of treatment is accorded Local 10 and its members, their rights would be meaningless. The decree shall provide that the Family Hospital Plan is restrained from denying to retired, present and future members of Local 10 the right to enroll in the Plan and to receive the benefits thereof on the same basis as the members of any designated union; from assuming a name which identifies it with any designated union; from maintaining its offices in the same quarters with, or using the same telephone number as, any designated union; from denying to Local 10 the right to have its president and treasurer be officers and members of the board of directors of the Plan.
Counsel may on settlement of the decree suggest for inclusion therein any other provisions consistent with the relief granted.
Y. As to the Federal Credit Union:
a. The court cannot entertain the request for injunctive relief with regard to its field of membership.
Plaintiffs argue that they are entitled to the same equitable relief in the case of the Credit Union as previously urged in connection with the Family Hospital Plan, the former also being an adjunct of Local 10 whose field of membership was restricted to members of Local 10. For the reasons hereinbefore stated, it would appear that limited relief along the lines suggested by the court would provide a reasonable solution of the problem.
However, a credit union is the creature of Federal enactment (Federal Credit Union Act; U. S. Code, tit. 12, ch. 14) and its field of membership is one of the subjects over which express supervisory powers have been placed in the Bureau of Federal Credit Unions. In fact, plaintiffs have protested to the director of the bureau that this Credit Union is wrongfully seeking to alter its field of membership. That protest has not been acted upon, because, evidently, the last amendment which was approved by the director simply froze the membership as of December 5, 1958, and no amendment has as yet been presented threatening the rights of members of Local 10. Plaintiffs obviously have not exhausted their remedies before the bureau. The action insofar as it requests this relief must be regarded as premature.
*51 Despite their protest to the bureau, plaintiffs maintain that this court has jurisdiction to enjoin the Credit Union from amending its charter and by-laws to exclude members of Local 10 and confine its field of membership to members of the new union. They point to the fact that the act provides no administrative remedies and that the relief requested would not impair the ability of the Credit Union to carry out its functions.
But the question is whether the Federal act deals with the subject of the field of membership of a credit union and grants to the bureau administrative power embracing that subject. If so, the bureau has primary jurisdiction to pass upon the question of any proposed changes in the field of membership (see n., Primary Jurisdiction, 51 Harv. L. B. 1251).
The act provides that membership shall be limited to groups having a common bond of occupation, association or address “ to the extent permitted by rules and regulations ” prescribed by the bureau (U. S. Code, tit. 12, § 1759). The organization certificate, which must specify the proposed field of membership, and a form of proposed by-laws prepared by the bureau to be filled in and used by all credit unions, must be approved by the bureau. The right of amendment is expressly reserved. The organization certificate provides that the membership shall be as set forth in the attached by-laws and amendments thereto approved by the bureau, and the by-laws provide that no amendments thereto shall be effective unless approved in writing by the bureau.
It is clear that Congress has actually legislated on the precise subject of field of membership of these Federal instrumentalities and placed administrative supervision of that subject with the bureau. The procedure mandated by the act must be observed (Franklin Nat. Bank v. New York, 347 U. S. 373; Lauer v. Bayside Nat. Bank, 244 App. Div. 601). Matter of Baldwinsville Fed. Sav. & Loan Assn. (268 App. Div. 414) cited by plaintiffs, is not in point.
b. The Federal Credit Union is entitled to a dismissal of plaintiffs’ claim against it for damages for conspiracy.
It is expressly provided that a credit union may sue and be sued. The court accordingly reaches the merits of this claim for damages.
The court finds that the Credit Union committed no actionable tort in furtherance of the alleged conspiracy. Becoming the lessee of the premises in place of Local 10 and then subletting to it may have been intended to aid defendant officers to pre *52 pare for secession and prevent National from taking the lease over as an asset of Local 10; but it was a justifiable business measure in its own interest to assure continued possession of quarters in view of the developing conflict. Moreover, plaintiffs were not damaged by said act, since they did gain possession no later than they would have, had the lease remained in Local 10’s name. Amending its by-laws to freeze its membership as of December 5, 1958 may have been of assistance to the new union, but it was a perfectly legal act and a proper measure in its own interest to avoid the requirement that members leaving the field of membership must terminate their membership and be paid their investments.
Since the court has found no basis, for plaintiffs’ claim of conspiracy in the alleged luring of members from Local 10 to the new union, the contention that the Credit Union participated therein and is jointly and severally liable for damages is rejected.
As previously stated, the only actionable conspiracy in this case is with regard to the dissipation of Local 10’s assets. The Credit Union has not been connected in any manner with that cause of action.
This claim for damages against the Credit Union is accordingly dismissed on the merits.
VI. Plaintiffs are entitled to Local 10’s telephone number to the exclusion of the defendants and the new union.— This is an asset of Local 10 which remains with Local 10.
The court will not require the new union to move from the building in which it is now operating. The court has granted what it deems reasonable relief along the lines suggested by plaintiffs in restraining the Family Hospital Plan from maintaining its offices in the same quarters with the new union. A similar separation of the Credit Union from the new union should be directed, in the court’s opinion, if the final determination of the question of the field of membership is that it shall consist of members of both Local 10 and the new union.
The judgment herein shall be, without costs to either party. Settle judgment accordingly.
This opinion constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.
Counsel may obtain their exhibits from the Clerk.